# EXHIBIT G

| | |
|---|---|
| DISTRICT COURT, COUNTY OF SAN MIGUEL, COLORADO<br><br>Court Address:   305 West Colorado Avenue<br>                          Telluride, CO 81435 | DATE FILED: February 12, 2020 7:44 AM<br>FILING ID: C6387616E9A13<br>CASE NUMBER: 2019CV30047 |
| **Plaintiffs:**<br><br>PEAKS CAPITAL PARTNERS, LLC; TELLURIDE RESORT & SPA, LLC; HIGHLANDS RESORTS AT THE PEAKS, LLC; and EDWARD D. HERRICK, JR.<br><br>**v.**<br><br>**Defendants:**<br><br>H. CURTIS BRUNJES; TSG SKI & GOLF, LLC; THE PEAKS OWNERS ASSOCIATION, INC.; and PEAKS HOTEL, LLC | **▲ COURT USE ONLY ▲** |
| ***Attorneys for Plaintiffs:***<br><br>Daniel M. Reilly, # 11468, dreilly@rplaw.com<br>Clare S. Pennington, # 37896, cpennington@rplaw.com<br>Michael P. Robertson, #41344, mrobertson@rplaw.com<br>**REILLY LLP**<br>1700 Lincoln Street, Suite 2400<br>Denver, Colorado 80203<br>Phone: 303-893-6100     Fax: 303-893-6110 | Case Number:  2019CV30047<br><br>Division/Courtroom:  3 |

## FIRST AMENDED COMPLAINT AND JURY DEMAND

Plaintiffs, Peaks Capital Partners, LLC ("PCP"), Telluride Resort & Spa, LLC ("TRS"), Highlands Resorts at the Peaks, LLC ("HRP"), and Edward D. Herrick, Jr. ("Herrick"), state and allege as follows:

1

## INTRODUCTION

1.     This action arises out of Defendants' conduct in designing and then implementing a coordinated scheme intended to unlawfully coerce Plaintiffs into paying money to Defendants that Defendants knew was not owed.

2.     Between 2009 and mid-2015, TRS owned all of the 177 residential and commercial condominium units in a residential and commercial building in Mountain Village, Colorado, known and commonly referred to as The Peaks.  During this period, TRS paid all assessments that were imposed by The Peaks Owners Association, Inc. ("POA"), which is the homeowners' association governing The Peaks.

3.     TRS satisfied its assessment obligations between 2009 and mid-2015 through an agreed-upon process that was approved each year by the POA.  Under this POA-approved process, TRS paid The Peaks' bills on behalf of the POA as the expenses were incurred during the year.  Each year, the POA then "credited" the amounts of these payments advanced by TRS on the POA's behalf against the assessment amounts owed to the POA from TRS (hereafter referred to as the "True-Up Process").  H. Curtis Brunjes ("Brunjes") served as an officer and director of the POA at all times between 2009 and the present.  Every year between 2009 and mid-2015, Brunjes personally approved TRS's payment of assessments through the True-Up Process.

4.     In July 2015, TSG Ski & Golf, LLC ("TSG") acquired many of the Peaks condominium units from TRS and assumed control over the POA's board of directors at that time.  In July 2015, TSG also assumed control over management of the POA through TSG's subsidiary, Peaks Hotel, LLC, being appointed POA manager.  TSG conducted extensive due diligence on The Peaks' operations and finances during the period of its July 2015 acquisition.

2

Through this due diligence process, Plaintiffs engaged in numerous communications through which the True-Up Process was plainly disclosed to TSG. Plaintiffs continued to answer TSG's questions regarding the True-Up Process continuing into 2016 after the sale had closed, and TSG's accountants confirmed during this period that they understood the True-Up Process that had been used and approved between 2009 and 2015.

5.      TSG, the POA, Brunjes, and Peaks Hotel, LLC (collectively, "Defendants") all knew that TRS had paid its assessment obligations between 2010 and 2015 through the True-Up Process. This True-Up Process was authorized in The Peaks' governing documents, endorsed and approved by all POA officers and directors at the time, and disclosed to TSG and Peaks Hotel, LLC in 2015.

6.      Three years after TSG's acquisition, in or around the fall of 2018, Defendants began conspiring and then implementing their agreed-upon plan to coerce Plaintiffs into paying money that was not owed. The first affirmative step in implementing this scheme occurred in or around October 2018, when Defendants commissioned a sham "internal audit" to be performed by an accountant employed by TSG. Defendants intentionally organized and manipulated this internal audit in a way where it was guaranteed to yield false and misleading results regarding the assessments paid by TRS between 2009 and mid-2015. Defendants intentionally withheld material documents from the accountant performing the internal audit, and intentionally chose not to disclose to the accountant the existence of the True-Up Process that was approved by the POA each year between 2009 and 2015. As a result, TSG's accountant incorrectly concluded that TRS failed to pay any assessments between 2009 and 2015 and likely committed "fraud" as a result.

7.    The second step in Defendants' coordinated scheme occurred in or around November 2018, at which time Defendants engaged Haynie & Company, P.C. ("Haynie"), TSG's longtime outside accountants, to perform certain "agreed-upon procedures" relating to TRS' payment of assessments between 2009 and 2015.  As with the "internal audit" performed by TSG, Defendants intentionally manipulated the procedures performed by Haynie in order to ensure that Haynie's work would yield false and misleading results.  For example, Defendants intentionally limited the scope of Haynie's work to identifying any assessments that were paid by TRS directly into the POA's bank accounts.  Defendants knew that no TRS payments of assessments that were accomplished through the True-Up Process would show up in the bank statements provided to Haynie.  Defendants purposely withheld the existence of the True-Up Process from Haynie in its performance of the agreed-upon procedures, including withholding from Haynie's consideration the pertinent governing documents of The Peaks which disclosed the True-Up Process.

8.    The agreed-upon procedures performed by Haynie simply confirmed what Defendants already knew: that TRS did not pay assessments between 2009 and 2015 through depositing funds directly into the POA's bank accounts.  Haynie, however, included a series of disclaimers in its final report for the agreed-upon procedures engagement.  Haynie made clear that it had not conducted a "review," which is a defined term in the accounting industry and a type of engagement that provides a significantly greater level of assurance compared to an "agreed-upon procedures" engagement.  Haynie also made clear that it did not express any "opinion or conclusion" regarding the amounts of assessments paid by TRS given the narrow scope of its engagement.

4

9.      Plaintiffs remain members of the POA through their continued ownership of numerous condominium units in The Peaks. Herrick also served as one of the five directors on the POA Board during this period in late 2018 when Defendants clandestinely implemented their scheme to concoct a false claim that Plaintiffs owed money to the POA.  Notwithstanding Plaintiffs' positions in the POA, Defendants intentionally failed to disclose any information concerning the internal audit or Haynie's agreed-upon procedures engagement to Plaintiffs.  At no time between 2009 and 2018 did Defendants express any concern to Plaintiffs over the amounts of assessments paid by TRS.

10.      Then, on March 21, 2019, with no advance notice to Plaintiffs, Defendants set in motion the third step in their scheme by broadly circulating a debt collection letter (hereafter referred to as the "Debt Collection Letter") to 28 parties, most of whom have no relation to Plaintiffs.  In the Debt Collection Letter, Defendants claimed that Plaintiffs owed more than $15.5 million.  Defendants claimed that this $15.5 million total was owed by Plaintiffs because TRS and Herrick failed to pay **any** assessments between 2010 and 2015. Shockingly, the letter fails to mention, acknowledge, or give any credit for the assessments that were paid by TRS through the True-Up Process even though this system was approved by Brunjes and the POA at all times between 2009 and 2015. At the time Defendants broadly published the Debt Collection Letter, they knew that the letter's calculation of allegedly unpaid assessments was false and misleading.

11.      In addition, in an effort to bolster the credibility of the Debt Collection Letter's $15.5 million calculation of alleged unpaid assessments, the letter blatantly misrepresents the nature and scope of Haynie's work.  The Debt Collection Letter falsely asserts that Haynie performed a "formal review" of the assessments paid by TRS between 2009 and 2015, and that

5

Haynie's conclusions "confirmed" that TRS failed to pay any assessments during this period. Defendants broadly circulated these false and misleading statements despite knowing that Haynie had not performed a review or reached any conclusions regarding the amounts of assessments paid by TRS.

12.     Before circulating the Debt Collection Letter in March 2019, Defendants knew that the Colorado Common Interest Ownership Act (CCIOA) sets forth mandatory debt collection procedures to be followed by the POA when attempting to collect unpaid assessments from unit owners.   CCIOA requires that the POA first send the unit owner a notice of delinquency specifying the "total amount due, with an accounting of how the total was determined" before turning a delinquent account over to a collection agency or referring it to an attorney for legal action.   C.R.S. § 38-33.3-209.5(5)(a)(V)(A).   The POA ignored this mandatory provision by, *inter alia*, failing to provide a notice of delinquency to Plaintiffs before authorizing the POA's legal counsel to circulate the Debt Collection Letter to numerous third parties. The governing documents of The Peaks mirror these requirements.   Upon information and belief, Defendants chose to ignore the mandatory debt collection process required under CCIOA and The Peaks' governing documents and widely circulate the Debt Collection Letter to numerous third parties in order to maximize pressure on Plaintiffs to extort a payment.

13.     Shortly after the Debt Collection Letter was broadly circulated by Defendants, the POA and Brunjes were forced to concede to the Association's members that the letter's $15.5 million calculation was false and that TRS was entitled to credits under the True-Up Process that was approved at all times between 2009 and 2015.   Notwithstanding this concession, however, Defendants have inexplicably refused to retract or modify their baseless $15.5 million monetary demand.

14.     Plaintiffs now bring this action to hold Defendants accountable for the significant monetary harm caused by Defendants' numerous and intentional violations of Colorado law, The Peaks' governing documents, and their fiduciary obligations to Plaintiffs.

## PARTIES, JURISDICTION AND VENUE

15.     Plaintiff PCP is a Colorado limited liability company with its principal place of business in Telluride, Colorado.

16.     Plaintiff TRS is a Delaware limited liability company with its principal place of business in Telluride, Colorado.

17.     Plaintiff HRP is a Delaware limited liability company with its principal place of business in Telluride, Colorado.

18.     Plaintiff Herrick is a resident of the State of Colorado who resides in San Miguel County.

19.     Defendant TSG is a Delaware limited liability company with its principal place of business in Mountain Village, Colorado.

20.     Defendant POA is a Colorado nonprofit corporation with its principal place of business in Mountain Village, Colorado.

21.     Defendant Peaks Hotel, LLC is a Delaware limited liability company with its principal place of business in Mountain Village, Colorado.

22.     Upon information and belief, Defendant Brunjes is a resident of Phoenix, Arizona.

23.     The Court has jurisdiction over this matter under the laws of the State of Colorado because Defendants TSG, Peaks Hotel, LLC, and the POA regularly transact business in

7

Colorado and because all of Defendants' wrongful acts giving rise to the claims brought herein occurred in Colorado.

24.      Venue lies in this District pursuant to C.R.C.P. 98 because the real property that is the subject of this proceeding is situated in this county; because one or more of the contractual obligations at issue were to be performed in this county; because one or more of the tortious acts at issue were committed in this county; and because one or more of the Defendants have their principal place of business in this county.

25.      In addition, the parties have voluntarily submitted to the jurisdiction of this Court. The claims and allegations set forth herein are brought in connection with the Declaration of Covenants, Conditions and Restrictions for Condominium-Hotel Operations of the Peaks Resort, originally recorded on or around May 29, 1992, and later amended.   The Declaration, as amended, contains a mandatory forum selection clause, which provides that "[a]ny legal action brought in connection with this Declaration shall be commenced in the District Court for San Miguel County, Colorado, and by acceptance of a deed to a Unit each Unit Owner voluntarily submits to the jurisdiction of such court."  Plaintiffs and Brunjes are, directly or indirectly, Unit Owners in The Peaks pursuant to the Declaration, and are thereby bound by their agreement to resolve this dispute in this District Court of San Miguel County.

## GENERAL ALLEGATIONS

## BACKGROUND ON THE PEAKS

26.      The Peaks Resort and Spa, f/k/a Doral Telluride Resort and Spa (the "Peaks") is a residential and commercial condominium building located in San Miguel County, Colorado, with a street address of 136 Country Club Drive, Mountain Village, Colorado.

8

27.     The Peaks is marketed and operated as a ski-in/ski-out resort with amenities that include indoor and outdoor swimming pools, restaurants, banquet and conference facilities, a fitness center, and a full-service 42,000 square foot spa.

28.     The Peaks opened in or around 1992, and was a condominium association from its inception. The Peaks' building is comprised of 177 residential condominium units, 14 commercial units, and approximately 26 penthouse units on the top floor.

29.     TRS was created in the early 1990s.  When The Peaks opened in or around 1992, TRS owned all of the residential condominium units and commercial units in The Peaks.  Since the inception of The Peaks, the penthouse units on the top floor of The Peaks building have been owned by private parties unaffiliated with TRS.

30.     In addition to the residential and commercial units that were originally all owned by TRS and the penthouse units that were each privately owned, The Peaks building also has many areas that are typically referred to as the building's "common elements."  The common elements in The Peaks building include items such as the exterior lawn, the internal hallways and stair wells, the front desk, and the building's exterior and roof.   These common elements are owned by the owners of the residential, commercial, and penthouse units as tenants in common.

31.     Since its inception, the business and affairs of The Peaks have been overseen by the homeowners' association, which is comprised of all the owners of the residential condominium units, commercial units, and penthouse units in The Peaks building.  From 1995 to the present, the homeowners' association of The Peaks has been named and referred to as the Peaks Owners Association (the POA).

32.     The POA, through the POA's elected Board of Directors, is in charge of managing and overseeing the expenses incurred to maintain and operate the building's common

9

elements. The owners of the residential, commercial, and penthouse units in The Peaks are subject to assessments from the POA to pay the expenses incurred to maintain and operate the building's common elements.

33. The residential condominium units in The Peaks are typically rented out for much or all of the year through The Peaks' rental program. In this way, The Peaks is operated and maintained much like a hotel.

## THE PEAKS GOVERNING DOCUMENTS

34. On August 17, 1991, the original Bylaws of Doral Telluride Resort Owners Association, Inc. were adopted (hereafter referred to as the "Original Bylaws").

35. The Doral Telluride Resort Owners Association, Inc. was established as a Colorado nonprofit corporation pursuant to its articles of incorporation in or around May 1991. On or around June 12, 1995, the Association's name was changed to The Peaks Owners Association, Inc. (POA).

36. Pursuant to the Original Bylaws, the POA's elected Board of Directors ("POA Board") is responsible for managing and overseeing the business and affairs of the POA.

37. The Original Bylaws mandate that the POA Board "collect promptly" any and all delinquent assessments owed by any owner(s) of the residential or commercial condominium units within the Peaks.

38. The Original Bylaws require the POA Board to maintain full and accurate books and records relating to receipts, expenses, and disbursements of the POA. The Original Bylaws also require the POA Board to provide any owner of a residential or commercial condominium unit within The Peaks a full and accurate statement of any claimed unpaid assessments upon request from the unit owner.

10

39.     The Original Bylaws also define the roles and responsibilities of the POA's officers.  Per the Original Bylaws, the President of the POA shall: (1) act as the POA's Chief Executive Officer, (2) maintain active control over the affairs and business of the POA, and (3) supervise the POA's officers, agents, and employees.  The Original Bylaws also state that the POA's Vice President is in charge of assisting the POA's President in fulfilling his duties.

40.     The original Declaration of Covenants, Conditions, and Restrictions Establishing a Plan for Condominium and Fractional Estate Ownership of Doral Telluride Resort and Spa (hereafter referred to as the "Original Declaration") was executed in or around April 1992 and was recorded in San Miguel County on May 29, 1992.

41.     The Original Declaration states that all owners of residential and commercial condominium units within The Peaks must pay assessments levied by the POA to cover the common expenses related to the maintenance and operation of The Peaks.  The Original Declaration grants the POA Board broad discretion relating to the allocation and collection of such assessments, stating that the POA Board may "establish *any reasonable system* or billing period for collection of common expenses, in advance or arrears as deemed desirable, and all assessments shall be paid at the times *and in the manner* determined by the Board…." (Emphasis added).

42.     Pursuant to the Original Declaration, any owner of a residential or commercial condominium unit may request a written statement from the POA identifying the amount of any unpaid assessments and the dates upon which these assessments were due.  The Original Declaration requires the POA Board or its managing agent to provide such information in writing within 10 days of receiving the request from the unit owner.  The Original Declaration also

11

specifies that this written statement must provide "credit" to the unit owner for "advance payments or for prepaid items."[1]

### HISTORICAL PRACTICE USED BY TRS AND THE POA FOR PAYMENT OF TRS ASSESSMENT OBLIGATIONS

43.     For periods in and before 2009, the POA, through the POA Board, approved and implemented a system through which TRS, as the sole owner of all the residential and commercial condominium units in The Peaks, would pay its assessment obligations by paying The Peaks' bills at the time they were due and then later receiving a "credit" from the POA for these advance payments TRS had paid on the Association's behalf.

44.     For periods in and before 2009, the POA, through the POA Board, approved and implemented a process of allocating The Peaks' common area maintenance and operating expenses between (1) TRS, who owned roughly 80% of the Peaks building based upon unit square footage, and (2) the owners of the penthouse units at the Peaks, who owned roughly 20% of the Peaks building based on unit square footage.  The POA-approved allocation process for periods in and before 2009 created an "80/20 split" between TRS and the penthouse owners in terms of allocated shares of common expenses, voting, and ownership of the common elements within the Peaks building.

45.     The historical procedure for POA budgeting and dues assessments was implemented and approved by the POA Board long before 2009.  This historical procedure followed five fundamental steps:

a.     POA Board Identifies Costs and Expenses Attributable to the POA:  First, the POA Board would meet each year to review projected costs and expenses for

---

[1] In this Complaint, the Original Declaration, the Original Bylaws, and the Responsible Governance Policies adopted by the POA Board are sometimes collectively referred to as the "Peaks Governing Documents."

operating and maintaining The Peaks' common elements and identify those costs and expenses related to the operation of the POA.

b.  <u>POA Board Approves Budget and Allocation</u>:  Second, the POA Board would then approve an annual operating budget for the POA for the upcoming year based on its review of the projected costs and expenses, and would approve a fair allocation of items to be included in the POA operating budget between TRS and the owners of the penthouse units.  Prior to the POA Board's approval of the annual operating budget, the proposed budget would be circulated to all POA members for comment. The POA Board meeting at which the POA Board would vote to approve the annual operating budget was also open to any POA members who wished to attend and comment on the proposed budget before it was approved by the POA Board.

c.  <u>TRS Pays The Peaks' Bills on the POA's Behalf During the Year</u>:  Third, after the POA Board's approval of the annual operating budget, TRS would receive and pay most or all of the expenses incurred during the year relating to The Peaks property.  TRS would also receive and pay all bills that were incurred in owning and maintaining the common elements within The Peaks building on the POA's behalf.

d.  <u>Penthouse Owners Assessed Roughly 20% of the Budgeted Expenses</u>:  Fourth, the POA would then assess the owners of the penthouse units roughly 20% of these budgeted POA operating expenses pursuant to the "80/20 split" described above. The POA would then remit these funds collected from the penthouse owners back

13

to TRS as a reimbursement of POA expenses that had been advanced and paid by TRS on the POA's behalf.

e. <u>POA Reviews and Approves Year-End True-Up</u>: Fifth, after the end of that fiscal year, a year-end "true-up" was performed and approved by the POA Board. Through this true-up process, if the actual POA expenses paid by TRS during the year exceeded the amount of expenses that had been previously budgeted by the POA Board, the owners of the penthouse units would owe the difference to TRS. If the actual expenses paid by TRS during the year were less than the amounts that had been previously budgeted, then TRS would owe the difference to the penthouse owners.

## PCP ACQUIRES TRS IN 2009

46.     In or around November 2009, PCP acquired TRS.  Herrick served as manager of PCP and held an indirect ownership interest in the company.  Through this acquisition, PCP became the sole manager and member of TRS and in turn the sole owner of all the residential and commercial condominium units in The Peaks.

47.     From late 2009 through July 2015, the POA Board consisted of five members. Herrick served as president of the POA Board during this period.

48.     Brunjes also served as a director on the POA Board during this entire period from late 2009 to July 2015.  Brunjes has been on the POA Board at all times from approximately 2005 to the present.  Brunjes is and has always been independent of TRS.  Brunjes, who directly or indirectly owns one or more penthouse units in The Peaks, serves as the representative for the penthouse unit owners on the POA Board.  Brunjes is compensated by the other penthouse unit owners for serving as a POA director.

14

49.     In addition to serving as a longstanding POA director, Brunjes has also served as an officer of the POA since in or before 2009 and continuing through the present.  Between 2009 and the present, Brunjes has held multiple officer positions for the POA.  Brunjes currently serves as vice president of the POA, and he served as the Association's president in 2018.

50.     Brunjes has a Master of Business Administration degree from the Kellogg School of Management at Northwestern University in Evanston, Illinois.  When seeking election to the POA Board during the period 2009 through 2015, Brunjes held himself out as having experience and qualifications in accounting and finance.

51.     From approximately late 2009 to July 2015, non-party Grand Heritage Hotel Group was retained by the POA Board to serve as managing agent of the Peaks and the POA.

52.     The POA Board also routinely utilized the services of independent counsel and independent accountants and auditors during this period from late 2009 to July 2015.

### THE POA BOARD APPROVES CONTINUED USE OF THE HISTORICAL ALLOCATION METHODOLIGY ALREADY IN PLACE

53.     In 2009, during the due diligence period leading up to PCP's acquisition of TRS, PCP representatives met with Brunjes and the POA's independent accountant to learn and understand the budgeting and dues process that was already in place.  During these meetings, Brunjes and the POA's accountant reviewed and explained the POA budgeting templates and procedures that had historically been used by the POA for the payment of TRS assessments prior to PCP's acquisition.

54.     On or around February 10, 2010, POA Director Kevin Jones circulated a memorandum titled "Peaks HOA Dues Methodology" to Brunjes and the other members of the POA Board.  This memorandum explained TRS' understanding of the historical budgeting and allocation procedures that were in place before 2009.

15

55.     In early 2010, the POA Board, including Brunjes, unanimously approved PCP continuing the historical methodology for POA dues budgeting and allocation, which included the longstanding practice of TRS satisfying its assessment obligations by paying The Peaks' bills at the time they were due and then later receiving a "credit" from the POA for these payments advanced on the POA's behalf.

56.     PCP realized no benefit or advantage by continuing the already-in-place procedure. Instead, this practice placed PCP and TRS at a financial disadvantage because it called for TRS to advance funds to pay operating expenses that were not owed by PCP or TRS, but instead were owed by the POA.  PCP agreed to continue the longstanding historical practice for POA dues budgeting and allocation, however, because Brunjes and the POA's accountants were already familiar with the True-Up Process.

57.     In early 2010, the first fiscal year of PCP's ownership of TRS, the POA Board, including Brunjes, received, discussed, and approved a detailed budget of the projected 2010 costs and expenses for the POA.  This budgeting process was consistent with the practice utilized by the POA Board in years prior to 2010.  The POA Board understood and unanimously approved the practice of TRS paying its 2010 assessment obligations through payment of The Peaks' bills during the year.  In early 2011, the POA Board, including Brunjes, received, discussed, and approved a 2010 year-end "true-up" calculation.  This true-up documentation provided a detailed comparison of the budgeted expenses from the beginning of the year with the actual expenses that were paid during the year by TRS.  Brunjes and the other POA Board members unanimously approved the year-end 2010 true-up, and in doing so expressly acknowledged that all assessments were properly paid by TRS during the year.

16

58.     This same True-Up Process was followed every year between 2010 and July 2015.  The POA Board, including Brunjes, received and discussed the true-up documentation each year.  This true-up documentation was prepared by the POA's management company and provided a breakdown of all expenses paid by TRS on the POA's behalf during the year.  Every year between 2010 and July 2015, the POA Board, including Brunjes, unanimously approved the POA budgets and true-up documentation.  In doing so, the POA Board approved each year the longstanding practice of TRS satisfying its assessment obligations through payment of The Peaks' bills on the Association's behalf.

59.     The annual true-up documentation was e-mailed directly to Brunjes every year between 2010 and 2015.  For example, on April 16, 2014, Brunjes received the 2013 year end true-up documentation:

---

**From:** Martha Roberts
**Sent:** Wednesday, April 16, 2014 11:50 AM
**To:** Curtis Brunjes; todd@herrickco.net
**Cc:** Kevin Jones
**Subject:** 2013 True-up

Hi Curt,

The 2013 True-up is attached.  Kevin has reviewed it and is in agreement.  I did not include any of the changes we made for 2014 budget as this budget was prior to those adjustments.

The biggest difference is in utilities as we had discussed in the meeting.

I will send the 1st quarter statements to you this afternoon.

Please let me know if you have any questions.

Martha Roberts
Regional Controller
The Peaks Resort and Spa
(970) 728-2506

---

60.     Brunjes was extremely knowledgeable and informed regarding the budgeting and true-up process that was approved each year by him and the other POA Board members and through which TRS satisfied its assessment obligations through payment of The Peaks' bills.

For example, Brunjes confirmed his understanding of the budgeting and True-Up Process through a December 3, 2014, e-mail to the other POA Board members:

---

**From:** Curtis Brunjes [mailto:curtis@curtissaero.net]
**Sent:** Wednesday, December 03, 2014 7:55 PM
**To:** Todd Herrick; John Horn; Bruce MacIntire; Kevin Jones; Martha Roberts
**Cc:** Daniel Zemke
**Subject:** Updated budget

All-

Attached please find the updated budget for tomorrow's meeting.

It may have some small issues but, as always, we can (and should) update during the year and they can be rectified in the end-of year true-up if necessary.

Kevin, Martha- any visibility on 2014 true-up in order to know if we are starting from an OK place?

　　Curt

---

61.　　The True-Up Process that was utilized and approved by the POA Board between 2010 and 2014, including the practice of TRS satisfying its assessment obligations through paying The Peaks' bills on the POA's behalf, was further disclosed to the POA's outside accountants and the individual members of the Association who came to the POA Board meetings during this period.

62.　　At no time during this period from 2010 through 2014 did anyone, including Brunjes or the POA's accountants, claim or otherwise imply that TRS was not satisfying its assessment obligations through this longstanding and Board-approved True-Up Process.

### THE POA BOARD ADOPTS GOVERNANCE POLICIES IN 2012

63.　　The longstanding historical practice utilized and approved by the POA for the collection of assessments from TRS was authorized under the Original Declaration, which granted the POA Board broad discretion to "establish any reasonable system" to collect assessments and permitted the Board to collect assessments in any "manner" approved by the Board.

64.     In 2011, however, the POA Board elected to memorialize the longstanding True-Up Process at a more granular level in the POA's governing documents.  At this time, Brunjes and the other members of the POA Board engaged Diane Wolfson, outside counsel to the POA, to draft new "Responsible Governance Policies" for the Association. On June 26, 2011, Ms. Wolfson e-mailed Brunjes and Herrick to clarify that the new Responsible Governance Policies would be addressing the procedure being used by TRS to satisfy its assessment obligations through the payment of "HOA bills":

> From: Diane Wolfson <wolfson@telluridelaw.com>
> Subject: Peaks - Status on Legal Matters
> Date: June 26, 2011 at 3:56:51 PM MDT
> To: 'Todd Herrick' <Todd@herrickco.net>, 'Curtis Brunjes' <curtis@curtissaero.net>
> Cc: Wolfson@TellurideLaw.com
> Reply-To: Wolfson@TellurideLaw.com
>
> Todd and Curt:
>
> I hope your summers are going well.   Here is an update on the outstanding legal matters I am working on for the Peaks Owners Association.
>
> 1.     Responsible Governance Policies
> •        Revise to include collections policy to allow for how HOA bills are paid by TRS
> •        I'd like to get this out in the next week

65.     The new Responsible Governance Policies were formally adopted by the POA Board through a unanimous vote on March 22, 2012, and made effective as of January 1, 2012. During this March 22, 2012, POA Board meeting, Brunjes presented the Responsible Governance Policies to the POA Board for approval and represented that he personally had reviewed and approved the language of the Policies.

66.     The 2012 Responsible Governance Policies expressly acknowledged and disclosed that TRS "pays certain Association bills and obligations and then seeks reimbursement

19

from the Association."   The 2012 Responsible Governance Policies that were adopted and unanimously approved by the POA Board authorized the longstanding practice, stating that the POA "shall reimburse TRS quarterly for funds actually spent by TRS on Association operating expenses in accordance with the Association's approved budget, and all such funds shall be deemed a credit against quarterly operating assessments owed by TRS to the Association."

### TSG TAKES OVER MANAGEMENT AND CONTROL OF THE POA IN 2015

67.     In or around July 2015, TSG acquired 13 of the 14 commercial units in The Peaks from TRS.  As a condition of this purchase, Peaks Hotel, LLC, a TSG wholly-owned subsidiary, took over management of the POA, The Peaks property, and the rental program for the residential condominium units.

68.     In 2015, during the period leading up to this acquisition, TSG officers and accountants performed extensive due diligence into The Peaks' operations and finances. Through this process and its acquisition of The Peaks, TSG examined the longstanding budgeting and true-up process relating to POA expenses and assessments.  In 2015, Peaks Hotel, LLC, as the new manager of the POA and The Peaks property, also investigated and became knowledgeable regarding the longstanding POA budgeting and True-Up Process.

69.     Specifically, Tom Richards, TSG's Chief Financial Officer, Patrick Berry, TSG's Controller, Greg Pack, TSG's Chief Executive Officer, and Stefanie Solomon, TSG's General Counsel, all played integral roles in TSG's 2015 investigation into The Peaks' operations and finances.

70.     In 2015, TRS provided a copy of the 2014 budget and true-up documents to Patrick Berry, Tom Richards, Greg Pack, and Tom Richards.  In addition, TRS and TSG employees, including Patrick Berry and Tom Richards, engaged in a series of e-mail

20

correspondence and in-person meetings at TSG's offices through which TRS walked TSG

through the budgeting and true-up methodology that was used by the POA and through which

TRS paid its assessment obligations by advancing payments on the POA's behalf.

71.    These communications continued into early 2016 following TSG's acquisition.

For example, on February 29, 2016, an accountant for Herrick further disclosed to TSG

accountants Michael Rodriguez and Patrick Berry the budgeting and True-Up Process that had

been implemented and approved by the POA Board and through which TRS satisfied its

assessment obligations:

| | |
|---|---|
| **Subject:** | Re: POA Audit Request - TRS Invoices |
| **From:** | Lorrie Mahoney <lorrie@herrickco.net> |
| **Sent:** | Mon, 29 Feb 2016 14:06:50 -0700 |
| **Cc:** | "Berry, Patrick" <PBerry@tellurideskiresort.com> |
| **To:** | "Rodriguez, Michael" <mrodriguez@tellurideskiresort.com> |

2015 POA Budget Approved .xls
2014 POA Budget.xls

Michael - Those checks represent the Penthouse portion of common expenses paid by TRS. TRS would pay all the bills, the Penthouse would pay the POA for their share, and then the POA would reimburse TRS.  They reimbursed TRS based on budget and then true'd up once a year. Included are the 2014 and 2015 budgets.

Also, here is what Martha said regarding the POA files. Hopefully they are there somewhere. "When I left, they were in Rose's Office and she was very meticulous.  Unless they were pulled by someone else after she left…for research maybe…unfortunately I would suspect that Noel may have borrowed them during budget preparation "

72.    In 2015, TSG received the budgeting and true-up documentation covering the

period 2014 through June 2015.  In addition to these records, Defendants also possessed and

maintained control over the underlying accounting records and invoices supporting the true-up

documentation.  These records were kept and maintained in the ordinary course of business at

The Peaks property.  The physical records remained at The Peaks following TSG's acquisition.

73.    These underlying records and invoices remained onsite at The Peaks property and

within Defendants' knowledge and control until approximately May 2017.  On May 26, 2017,

through a series of e-mail correspondence from TSG with a subject line of "Ugly Secret,"

21

Brunjes directed that all of these historic accounting records be removed from The Peaks property.

74.     TSG did not object to or raise any concerns regarding the True-Up Process that was used by the POA and through which TRS paid its assessment obligations.

75.     In 2015, TSG and Peaks Hotel, LLC also received the Peaks Governing Documents, which included the 2012 Responsible Governance Policies that disclosed and authorized the practice of TRS satisfying its assessment obligations through "pay[ing] certain Association bills and obligations and then seek[ing] reimbursement from the Association."

76.     Subsequent to TSG's July 2015 acquisition of The Peaks commercial units, TSG, through a related entity, purchased multiple penthouse and residential condominium units in The Peaks.

77.     Beginning in or around July 2015 and continuing through the present, TSG controls the majority vote on the five-member POA Board and elects three of the directors each year.   In or around January 2019, Bill Jensen, TSG's Chief Executive Officer, was named President of the POA.   Tom Richards, TSG's Chief Financial Officer, also serves on the POA Board.

78.     In addition to the three Board positions controlled by TSG, Brunjes has continued to serve on the POA Board at all times from 2015 to the present.

79.     Herrick served as the fifth member of the POA Board from 2015 until approximately November 2018.

80.     Shortly after TSG's July 2015 acquisition, PCP distributed its remaining residential condominium units to PCP's investors.   Through this transaction in 2015, HRP

became the direct owner of approximately 47 residential units in the Peaks that were formerly held by TRS.  TRS continues to own one residential condominium unit in the Peaks.

81.     TRS and HRP have remained members of the POA through their continued ownership of units in the Peaks between 2015 and the present.  Herrick also continues to serve as manager of TRS, HRP, and PCP.

### TSG'S ASSOCIATION MANAGEMENT AGREEMENT AND RENTAL MANAGEMENT AGREEMENT

82.     In July 2015, the POA, TSG, and Peaks Hotel, LLC executed an Association Management Agreement (the "AMA").  The AMA was effective July 9, 2015.

83.     Herrick signed the AMA on behalf of the POA.  M.C. "Chuck" Horning, Jr. signed the AMA on behalf of both TSG and Peaks Hotel, LLC.  Horning signed the AMA in his capacity as "Managing Member" of both TSG and Peaks Hotel, LLC.

84.     TSG was a party to the AMA in its role as Peaks Hotel, LLC's "parent company."

85.     Through the AMA, the POA appointed TSG affiliate Peaks Hotel, LLC to manage and operate the POA and the Peaks property.  Pursuant to the AMA, Peaks Hotel, LLC agreed to manage and oversee the Peaks accounting, reporting, and internal controls, and to maintain "all reasonably available records of the affairs of the Association."  The POA delegated broad authority and discretion to Peaks Hotel, LLC to use any powers or authority deemed necessary to carry out the management services contracted for in the AMA.

86.     The powers and authority granted to Peaks Hotel, LLC under the AMA included the power to commence the initial process of the POA's collection policies for any delinquent assessments.

87.     Through the AMA's terms, Peaks Hotel, LLC agreed to perform its responsibilities in a "commercially reasonable, efficient and good faith manner."  Through the

2204154

AMA, Peaks Hotel, LLC also expressly acknowledged and agreed that it served "in a fiduciary capacity to the Association" under the AMA's terms.

88.     As consideration under the AMA, Peaks Hotel, LLC receives an annual "management fee" of $150,000.00.

89.     The AMA was amended in or around January 2017.  This First Amendment to the AMA, which provided Peaks Hotel, LLC additional management responsibilities, was signed by Brunjes as President of the POA and by Bill Jensen in his duel capacities as Chief Executive Officer of TSG and Chief Executive Officer of Peaks Hotel, LLC.

90.     In conjunction with the AMA, the POA, TSG, and Peaks Hotel, LLC also simultaneously executed a Rental Management Agreement ("RMA") effective July 9, 2015. M.C. "Chuck" Horning signed the RMA in his duel capacities as Managing Member of TSG and Managing Member of Peaks Hotel, LLC.

91.     Under the RMA, Peaks Hotel, LLC serves as manager of The Peaks rental program.  Through The Peaks rental program, the owners of the residential condominium units and penthouse units in the Peaks building may rent out their units to visitors much like a hotel.

92.     The AMA was incorporated by reference into the RMA, with the parties to the RMA agreeing that Peaks Hotel, LLC's role as manager of the POA and the Peaks property is a material and required condition for Peaks Hotel, LLC to serve as manager of the Peaks rental program under the RMA.

93.     The RMA provides that as long as Peaks Hotel, LLC serves as manager of The Peaks, "the Condominium Project may be known as 'The Peaks Resort and Spa, a Telluride Ski and Golf Property.'"

24

94.     As consideration under the RMA, Peaks Hotel, LLC receives forty percent (40%) of all gross revenues derived from The Peaks rental program less certain expenses.

## THE POA BOARD ADOPTS NEW RESPONSIBLE GOVERNANCE POLICIES IN 2018

95.     In or around December 2018, the POA Board adopted new Responsible Governance Policies.  These 2018 Governance Policies were "in addition to the terms of" the Original Declaration, the Original Bylaws, and the other governing documents of The Peaks. Brunjes signed and approved the 2018 Governance Policies in his capacity as President of the POA.

96.     The 2018 Governance Policies included a "Collection Process" to be followed by the POA when attempting to collect from POA members who were delinquent on their assessment obligations.  Pursuant to the mandatory "Collection Process" set forth in the 2018 Governance Policies, if an assessment owed by a unit owner became delinquent by over 90 days, the POA's counsel must send a "First Notice" to the unit owner.  This First Notice is required to specify, among other things, "the total amount due, with an accounting of how the total was determined."  The First Notice must also disclose to the unit owner that he may "request a copy of the Owner's ledger in order to verify the amount of the debt."

97.     The 2018 Governance Policies specified that the POA was required to act in "good faith" when communicating and coordinating with unit owners under this Collection Process.

98.     The 2018 Governance Policies expressly acknowledge that the POA Board has a "fiduciary responsibility" when making decisions that affect the members of the POA.

99.     The 2018 Governance Policies mandated that the POA maintain detailed records of all receipts and expenditures affecting the operation and administration of the POA.  These

records required to be maintained by the POA include "financial records sufficiently detailed to enable the Association to comply with C.R.S. sec. 38-33.3-316(8) concerning statements of unpaid assessments."   The POA, through the 2018 Governance Policies, acknowledged its obligation to comply with the Colorado Common Interest Ownership Act's provisions concerning collection of unpaid assessments.

100.    Under CCIOA's mandatory debt collection provisions, before imposing any fine on a unit owner, the POA must follow a "fair and impartial fact-finding process concerning whether the alleged violation actually occurred and whether the unit owner is the one who should be held responsible for the violation." C.R.S. § 38-33.3-209.5(2)(b)(I).

101.    In addition, CCIOA requires that before turning over a delinquent account of a unit owner to a collection agency or referring it to an attorney for legal action, the POA must first send the unit owner a notice of delinquency specifying the "total amount due, with an accounting of how the total was determined."   C.R.S. § 38-33.3-209.5(5)(a)(V)(A).

**TRS AND HRP BEGIN A BULK SALES PROGRAM IN JANUARY 2019**

102.    In late 2018, Herrick, on behalf of TRS and HRP, initiated a marketing and sales program through which most or all of the 47 residential condominium units owned by TRS and HRP would be sold through a single transaction or a small number of transactions to bulk buyers (hereafter referred to as the "Bulk Sales Program").

103.    As part of the Bulk Sales Program, Herrick retained the services of a prominent Telluride realtor to market and implement the program.  A listing agreement for the Bulk Sales Program was executed with Telluride Sotheby's International Realty on or around November 30, 2018.

26

104.    The realtor engaged to carry out the Bulk Sales Program received significant interest from potential buyers in early 2019.  On at least one occasion, the potential buyers were taken on tours through the Peaks building.

105.    Defendants knew in early 2019 that Herrick, on behalf of TRS and HRP, was attempting to facilitate a bulk sale of all remaining units through the Bulk Sales Program.

106.    Pursuant to the Original Declaration, as amended, any owner of a residential condominium unit in The Peaks could appoint his own rental agent or rent his unit(s) himself without using the services of Peaks Hotel, LLC under the RMA.

107.    TSG and Peaks Hotel, LLC knew that the Bulk Sales Program presented financial risk to them.  For example, if a buyer that obtained the 47 residential condominium units that were part of the Bulk Sales Program elected to use a rental management company other than Peaks Hotel, LLC, the revenue derived by TSG and Peaks Hotel, LLC through the RMA, and potentially the AMA, would be significantly reduced.

108.    In addition to the Bulk Sales Program, Plaintiffs' real estate professionals have also been marketing and attempting to sell certain individual residential condominium units owned by Plaintiffs.

## DEFENDANTS CONDUCT A SHAM INTERNAL AUDIT

109.    In or around the fall of 2018, Defendants began implementing their agreed-upon scheme designed to coerce Plaintiffs into paying money that was not owed.  The first step in this orchestrated plan occurred when Defendants directed a low-level accountant employed by TSG to perform an "internal audit" relating to the assessments paid by TRS between 2009 and mid-2015.

110.     The POA and Brunjes delegated responsibility for conducting the "internal audit" to TSG and Peaks Hotel, LLC.  TSG and Peaks Hotel, LLC then assigned responsibility for the internal audit to Ryan Burke, a TSG accountant.

111.     TSG and Peaks Hotel, LLC knew that Burke only recently graduated from college in 2016 and that he lacked the necessary experience and qualifications to perform a project of this complexity. TSG and Peaks Hotel, LLC, however, intentionally hand-selected Burke to evaluate the assertions that TRS had failed to satisfy its assessment obligations between 2010 and 2015.

112.     Defendants manipulated this "internal audit" process by, *inter alia*, intentionally (1) withholding critical records and information from Burke, and (2) failing to disclose the existence of the True-Up Process that was approved by the POA at all times between 2009 and 2015 and through which TRS satisfied all assessment obligations during this period. Defendants intended that this "internal audit" exercise yield false and misleading results concerning the assessments paid by TRS between 2009 and 2015.

113.     Defendants authorized and enabled Burke to draft and produce an internal audit report setting forth the conclusions of Burke's analysis (hereafter referred to as the "Burke Conclusions").  The Burke Conclusions fail to acknowledge or even mention the existence of the POA-approved True-Up Process.   Burke instead incorrectly concluded that TRS paid no assessments during the period 2010 to 2015, and that "[n]o true-up occurred to any of the expense accounts at the end of the year to reflect the actual expenses."

114.     The Burke Conclusions include multiple disclaimers that Burke was not provided with the necessary documentation to complete his analysis in a meaningful or reliable manner. Neither Burke nor anyone else from TSG or the POA alerted Plaintiffs of the "internal audit" or

28

requested any documentation from Plaintiffs. However, this lack of documentation did not prevent Burke from remarkably concluding that TRS and the individuals associated with it potentially committed "fraud."

115.    Defendants knew that the Burke Conclusions were false, misleading, and unreliable. Specifically, Defendants knew that the Burke Conclusions did not account for or consider the True-Up Process that was approved between 2009 and 2015 and through which TRS paid its assessment obligations.

116.    In early 2019, Defendants authorized and enabled the Burke Conclusions to be circulated to all members of the POA despite knowing the report was false and misleading.

117.    Although Plaintiffs were members of the POA and Herrick was a director on the POA Board until November 2018, Defendants intentionally failed to disclose any information regarding the internal audit to Plaintiffs until early 2019 when the Burke Conclusions were provided to all members of the POA.

## DEFENDANTS COMMISSION HAYNIE TO PERFORM INTENTIONALLY MISLEADING "AGREED-UPON PROCEDURES"

118.    In approximately November 2018, Defendants contacted Haynie to discuss the parameters of an agreed-upon procedures engagement. Prior to November 2018, Haynie had a longstanding relationship with Defendants and had provided accounting and auditing services to the POA and TSG for many years.

119.    The scope of Haynie's work on this engagement for the POA was defined in Haynie's engagement letter, which was dated December 3, 2018. Haynie's engagement letter plainly disclosed that Haynie's work did not "constitute an examination **or review**." Instead, as explained in Haynie's December 3 engagement letter, Haynie merely performed "agreed-upon procedures," which provide a significantly lower level of assurance compared to a formal

29

review.  Because Haynie merely performed agreed-upon procedures, Haynie would not "express an opinion or conclusion on dues paid by homeowners during the years ending December 31, 2009 – 2015."

120.    The procedures that were agreed upon by the POA and Haynie included simply having Haynie review the POA's bank statements for the period 2009 to 2015 to identify any assessments that were paid directly to the POA and deposited into the POA's bank account. Haynie was also asked to review the "By-laws and Declarations of the Association to ensure the accounting process aligns with these organizational documents."

121.    Haynie made "no representation regarding the sufficiency of the procedures described either for the purpose for which the agreed-upon procedures report has been requested or for any other purpose."  Instead, Haynie identified that "[t]he sufficiency of the [agreed-upon] procedures performed or to be performed is solely the responsibility of the Association…."

122.    Defendants knew and intended that the procedures agreed-upon with Haynie would yield false and misleading results regarding TRS' payment of assessments between 2009 and 2015.  For example, Defendants knew that under the True-Up Process, TRS paid its assessments through payment of The Peaks' bills on the POA's behalf.  Defendants also knew that these payments by TRS under the True-Up Process would not appear on the deposit records being reviewed by Haynie.

123.    Similarly, Haynie was only asked by Defendants to review some but not all of the Peaks Governing Documents. Defendants were intimately familiar with the 2012 Responsible Governance Policies.   Although the 2012 Responsible Governance Policies disclose and authorize the POA-approved True-Up Process under which TRS satisfied its assessment

obligations, Defendants intentionally withheld this material information from consideration in the agreed-upon procedures with Haynie.

124.    Haynie issued its report for the agreed-upon procedures engagement on or around February 7, 2019.  In this report, Haynie confirmed that "[w]e were not engaged to and **did not conduct an examination or review**, the objective of which would be the expression of an opinion or conclusion, respectively, on dues paid by homeowners during the years ending December 31, 2009 – 2015.  **Accordingly, we do not express such an opinion or conclusion**." (Emphasis added).

125.    Haynie's report identified no assessments that were paid by TRS through transferring funds directly into the POA's bank accounts.  However, Defendants knew that the results of Haynie's agreed-upon procedures were false and misleading because Haynie did not consider or account for the True-Up Process under which TRS paid its assessment obligations between 2009 and 2015.

126.    Defendants intentionally failed to disclose to Plaintiffs the retention of Haynie or the agreed-upon procedures that were being performed despite Plaintiffs' status as POA members and Herrick's position as a POA director.

### THE POA AND TSG KNOWINGLY CIRCULATE A FALSE AND MISLEADING DEBT COLLECTION LETTER IN MARCH 2019 TO NUMEROUS THIRD PARTIES

127.    Prior to March 2019, Defendants had never communicated to Plaintiffs any concern regarding the amount of assessments paid by TRS between 2009 and 2015.

128.    On March 21, 2019, the POA's outside legal counsel sent the Debt Collection Letter, which was titled "Collection of Past Due Operating Assessments Owed to the Peaks Owners Association" to 28 different parties.  The Debt Collection Letter was sent "on behalf of" both TSG and the POA.  Brunjes authorized the publication of the Debt Collection Letter and the

31

statements made therein.  Many of the 28 original recipients of the Debt Collection Letter were third parties who had no affiliation with TRS.

129.    In addition to the original 28 parties to whom the Debt Collection Letter was addressed and sent, the Debt Collection Letter was also circulated to all individual members of the POA.

130.    The stated purpose of the Debt Collection Letter was to "collect unpaid operating/Spa assessments for the period November 1, 2009 through June 30, 2015."  The Debt Collection Letter represented that "TRS and the individuals and entities associated with it were not paying their shares of dues.  In fact, we have been unable to locate any evidence that TRS ever was assessed and/or paid operating dues on the Commercial Units, or operating/Spa dues on the Condo Hotel Units during the period it was in control of the POA."

131.    Through the Debt Collection Letter, the POA and TSG made a "formal claim" under the 2018 Governance Policies for $15,521,747.  This figure purported to represent assessments that are "due and owing" from TRS from the period 2010 through June 30, 2015.  The POA and TSG also demanded that Plaintiffs pay significant interest, penalties, and attorneys' fees.

132.    The Debt Collection Letter asserted that TSG, "in its role as POA manager, confirmed that [the $15,521,747] operating/Spa assessments during this period had not been paid" through an internal audit performed by TSG's accountants.  The Debt Collection Letter threatened to foreclose on the condominium units owned by TRS, HRP, and others through "the commencement of a lawsuit against TRS, PCP" and other parties, "including principals of [these] entities."  The Debt Collection Letter identified Herrick by name as being a principal of PCP and TRS.

32

133.   The Debt Collection Letter intentionally clouded title on the residential condominium units owned by TRS and HRP.  The letter demanded that TRS, PCP, and HRP "refrain from disposing of the above-identified Units as well as any other TRS or PCP assets until this dues collection matter has been fully and finally resolved."  The POA and TSG sent the Debt Collection Letter to Land Title Guarantee Company's Telluride, Colorado office, which immediately froze the Bulk Sales Program and precluded the program from moving forward.

134.   The POA's outside legal counsel who sent the Debt Collection Letter on behalf of the POA and TSG represented that it was acting as a "debt collector."  The following disclaimer was included in the Debt Collection Letter: "This is an attempt to collect a debt.  Any information obtained will be used for that purpose.  You are now communicating with a debt collector."

135.   Defendants intentionally chose not to provide any form of advance notice to Plaintiffs before engaging a "debt collector" and broadly circulating the Debt Collection Letter.  Likewise, Defendants intentionally chose not to engage in any type of formal or informal request for information from Plaintiffs before publishing the Debt Collection Letter.  This failure to engage in reasonable diligence, including discussing the alleged unpaid assessments with Plaintiffs prior to engaging a "debt collector" and broadly circulating the Debt Collection Letter to numerous third parties, was intentional, was done in bad faith and with malice, and was in contravention of the Peaks Governing Documents and CCIOA.

136.   The $15,521,747 figure identified in the Debt Collection Letter failed to provide any credit or offset to Plaintiffs for paying its assessment obligations through the True-Up Process that was expressly approved by the POA and Brunjes each year between 2010 and June 2015.

137.     Defendants knew at the time the Debt Collection Letter was sent that TRS had satisfied its assessment obligations during the period 2010 to 2015 through the True-Up Process. Defendants intentionally chose to omit this material information from the Debt Collection Letter.

138.     Defendants knew at the time the Debt Collection Letter was approved and broadly circulated to numerous third parties that the 2012 Responsible Governance Policies expressly authorized the True-Up Process through which TRS satisfied its assessment obligations by paying The Peaks' bills and then crediting these advanced payments from TRS' assessment amounts.

139.     In the Debt Collection Letter, the POA and TSG represented that their claim of unpaid assessments in the amount of $15,521,747 was confirmed through both an "internal audit" performed by TSG and a "formal review" performed by Haynie.  These statements were intended to bolster the credibility of the $15.5 million calculation that was broadly circulated through the letter.

140.     In the Debt Collection Letter, Defendants intentionally misrepresented the scope and reliability of the "internal audit" performed by TSG and Peaks Hotel, LLC.  Defendants authorized and enabled the "internal audit" to be used as a basis for the Debt Collection Letter's allegations despite knowing that Burke's work was unreliable and misleading.

141.     In the Debt Collection Letter, Defendants also blatantly misrepresented the nature and scope of Haynie's engagement.  Defendants represented through the Debt Collection Letter that "**the results of [Haynie's] review confirmed that little or no operating/Spa assessments were paid" by TRS.**

142.     Defendants knowingly and intentionally circulated these false statements through the publication of the Debt Collection Letter. For example, Defendants knew that Haynie did not

34

perform a "review," which is a standard and defined term in the accounting field and carries a higher level of assurance than an "agreed-upon procedures" engagement. Defendants also knew that Haynie did not express any opinions or conclusions regarding assessments paid by TRS, which is contrary to the Debt Collection Letter's representation that Haynie's work "confirmed" no assessments were paid.

143.   Defendants authorized the publication of the Debt Collection Letter despite knowing that the statements and positions set forth in the letter were false and misleading.

144.   Defendants' conduct in knowingly publishing false and misleading statements was an egregious breach of the fiduciary obligations of care, loyalty, and good faith they owed to Plaintiffs.

145.   Defendants' conduct in knowingly publishing false and misleading statements through the Debt Collection Letter was reckless, intentional, and performed with malice and in bad faith.

### TSG AND THE POA EXECUTE AN AGREEMENT FOR TSG TO PAY THE POA'S LEGAL AND ACCOUNTING FEES

146.   Shortly after circulating the Debt Collection Letter, the POA and TSG executed an "Attorneys Fees and Costs Funding Agreement" effective June 24, 2019 (hereafter referred to as the "Attorney Fee Agreement"). This Attorney Fee Agreement was signed by Brunjes in his capacity as Vice President of the POA and Bill Jensen as Chief Executive Officer of TSG. At the time this Agreement was executed, Bill Jensen simultaneously served as President of the POA.

147.   Under the Attorney Fee Agreement, TSG agreed to reimburse the POA for "all attorneys fees and costs incurred related to the historical dues payment dispute, including fees

incurred by POA special counsel and POA general counsel as well as fees and costs incurred by outside accounting firms or other experts."

148.     The Attorney Fee Agreement stated that in or around October 2018, Peaks Hotel, LLC, acting as manager of the POA, "discovered" that TRS had not paid significant assessments for the period November 2009 through June 2015.  The Attorney Fee Agreement also stated that TSG and Peaks Hotel, LLC jointly performed the "internal audit" which "confirmed significant operating/Spa assessments had not been paid during the years 2010 through 2015."

149.     The Attorney Fee Agreement also stated that The Peaks "has significant deferred maintenance and capital reserve needs."   The Agreement contends that these financial deficiencies "resulted from TRS' failure to pay significant operating/Spa assessments for the approximate period November 1, 2009 through June 30, 2015."

150.     In October 2018, Herrick served as a Director on the POA Board. TRS and HRP were also members of the POA.   Defendants, however, intentionally concealed this alleged newly "discovered" information from Herrick and the other Plaintiffs.

151.     The terms of the Attorney Fee Agreement acknowledge that TSG has a "significant investment in The Peaks" and thus a significant financial stake and incentive in pursuing this dispute.

152.     The Attorney Fee Agreement also confirms that "[a]n internal audit by TSG/PHLLC [Peaks Hotel, LLC]" served as a primary basis for the Debt Collection Letter.

### THE POA BOARD AND POA LEGAL COUNSEL HAVE ACTED UNDER IRRECONCILABLE CONFLICTS OF INTEREST

153.     Between 2018 and the present, Bill Jensen has simultaneously acted as a director and officer of the POA and as TSG's Chief Executive Officer.

154.   Between 2018 and the present, Tom Richards has simultaneously acted as a director and officer of the POA and as TSG's Chief Financial Officer.

155.   Jensen and Richards both know that TSG has a significant financial interest in obtaining money from Plaintiffs to offset the costs of The Peaks' "deferred maintenance and capital reserve needs."   Jensen and Richards also know that the Bulk Sales Program presents significant financial risk to TSG because the revenue obtained by TSG and Peaks Hotel, LLC through the RMA, and potentially the AMA, would be materially reduced if a buyer elected to use a rental management company other than Peaks Hotel, LLC.

156.   Jensen and Richards have repeatedly placed the interests of TSG above those of Plaintiffs and the POA's members by, *inter alia*, enabling TSG's accountants to conduct a sham internal audit and manipulating the results of Haynie's agreed-upon procedures such that the Association's membership would be misled into authorizing the Debt Collection Letter to be circulated based on a misbelief that TRS failed to satisfy its assessment obligations between 2009 and 2015.

157.   Jensen and Richards' conduct, as alleged herein, breached their fiduciary obligations of loyalty and impartiality to Plaintiffs.  Jensen and Richards have also systematically failed to comply with the POA Board's conflict of interest policies.

158.   In approximately 2014, Telluride attorney Joe Solomon took over as the POA's general counsel.   Mr. Solomon has served as the POA's general legal counsel at all times between approximately 2014 and the present.

159.   Joe Solomon is a shareholder in the law firm Solomon & Solomon, P.C. The other named partner of "Solomon & Solomon" is Joe Solomon's wife Stephanie Solomon.   At all times between 2018 and the present, Joe Solomon has served as general counsel to the POA

37

while Stephanie Solomon has simultaneously served as general counsel for TSG.  In addition, the Solomon & Solomon website lists and markets TSG as one of the firm's "Representative Clients."

160.    When advising the POA on matters relating to the Debt Collection Letter between 2018 and the present, Joe Solomon has been acting under an irreconcilable conflict of interest given his law firm's extensive relationship with TSG and dual representation of both the POA and TSG.

**DEFENDANTS REFUSE TO WITHDRAW THEIR DEMAND FOR MONEY DESPITE KNOWING THEIR ALLEGATIONS AND CALCULATIONS ARE FALSE**

161.    Upon receiving the Debt Collection Letter, Plaintiffs have expended a significant amount of time and resources responding to and disproving the Debt Collection Letter's false and misleading allegations.

162.    Since receiving the Debt Collection Letter in March 2019, Plaintiffs have provided voluminous information to Defendants confirming that TRS paid all of its assessment obligations through payment of The Peaks' bills on the POA's behalf.  In May 2019, Herrick and an accountant from TRS also voluntarily participated in a face-to-face meeting with TSG officers Patrick Berry and Bill Jensen to answer TSG's questions concerning the budgeting and True-Up Process that was followed and approved between 2010 and 2015.

163.    Defendants have admitted that the $15,521,747 figure that was published through the Debt Collection Letter is inaccurate.  For example, less than one month after publishing the Debt Collection Letter to numerous third parties, Brunjes, during an April 19, 2019, POA meeting, confirmed his knowledge that between 2010 and June 2015 "expenses were paid instead of dues" by TRS.  This statement is recorded in the meeting minutes.  Brunjes and the

38

other Defendants knowingly and intentionally omitted this material information from the Debt Collection Letter.

164.    Similarly, these same meeting minutes confirm the statement made by POA legal counsel Joe Solomon that "[t]he goal is to obtain certainty concerning any shortfall, **and if it exists**, to recapture money due the POA."  The POA's conduct in publishing the Debt Collection Letter without first ensuring it had confirmation of the existence and amount of the alleged unpaid assessments is a blatant violation of the POA's legal, contractual, and fiduciary obligations to Plaintiffs.

165.    During a May 23, 2019, POA meeting, the minutes from the previous April 19 POA meeting were reviewed and approved by the POA Board.  Significantly, the meeting minutes from the May 23, 2019, POA meeting confirm the following exchange:

> Mr. Herrick asked it be added that "Curt Brunjes stated that 'we know the amount in the demand letter is not $15M but it is in the millions.' Mr. Brunjes agreed with this statement, stating he recognized TRS should be able to show it paid some common expenses directly and would thus be entitled to an offset.

166.    Brunjes and the POA have admitted that the $15.5 million calculation that was published through the Debt Collection Letter is false, and that TRS was in fact "entitled to an offset" for the common expenses it paid on the POA's behalf between 2010 and 2015.

167.    Coming out of this POA meeting, Plaintiffs provided all Defendants with the same budget and true-up documentation that was previously provided to and approved by Brunjes and the POA Board for the fiscal years 2012, 2013, and 2014.  This information confirmed that TRS had in fact satisfied all of its assessment obligations through the True-Up Process.  Plaintiffs also offered the POA, including Brunjes, the opportunity to inspect and copy any of the underlying invoices and supporting documentation for the budget and true-up

39

documentation that had been produced for this 2012-2014 period.  In addition, Plaintiffs also voluntarily provided Defendants with extensive records and information in the form of general ledger detail and bank statements.

168.    In light of Brunjes' statements during the April 19, 2019, POA meeting and Defendants' receipt of the 2012-2014 budgeting and true-up documentation which had been contemporaneously reviewed and approved by Brunjes and the other POA Board members, Plaintiffs formally requested that Defendants withdraw their demand for money and retract the Debt Collection Letter.

169.    Inexplicably, Defendants refused to retract or modify the Debt Collection Letter in any way despite knowing the $15.5 million calculation is unsupportable.

170.    On July 28, 2019, TSG provided a memorandum to the POA titled "PCP Dues Status."  The stated purpose of this memorandum was to provide a "progress update on the PCP dues paid versus expense reconciliation" issue.  This memorandum confirmed that, after reviewing the information that had been provided by Plaintiffs, TSG was unable to identify any bills that were not properly paid by TRS during the year or any assessment amounts that were not properly credited through the True-Up Process.

171.    In this July 28 memorandum, TSG failed to identify any support for the previously-published $15.5 million monetary demand.  Instead, TSG acknowledged that it was now shifting positions and hoping to prove a "potential misstatement of $754,990"—a significant deviation from its previous claim of $15.5 million—by challenging certain decisions made and approved by the POA Board and Brunjes many years ago.

172.    Upon receipt of the July 28 memorandum, Plaintiffs again requested that Defendants retract or otherwise modify and disclaim the false and misleading allegations and

40

calculations set forth in the Debt Collection Letter.  Defendants again refused to retract or otherwise modify the Debt Collection Letter in any way.

173.    To date, despite numerous requests from Plaintiffs, Defendants have never withdrawn or modified their demand for money or any of the false and misleading statements that were published through the Debt Collection Letter.

174.    Further, Plaintiffs have made numerous requests that Defendants identify and describe the specific basis for the Debt Collection Letter, including any expenses that the POA claims were not paid by TRS and the specific dates and amounts of any POA assessments that the POA asserts were not satisfied through credits in accordance with the POA Board-approved True-Up Process. Defendants have been unwilling, and presumably unable, to provide this information.

### DEFENDANTS' CONDUCT HAS RESULTED IN SIGNIFICANT HARM TO PLAINTIFFS

175.    Defendants' conduct in planning and then carrying out their coordinated and agreed-upon scheme that was intended to extort Plaintiffs into paying money that is not owed through repeated acts of harassment and intimidation has directly and proximately caused Plaintiffs to experience significant monetary harm.  These actions by Defendants include: (1) authorizing a sham "internal audit"; (2) manipulating Haynie's "agreed-upon procedures" in order to ensure they would yield false and misleading results; (3) disregarding the mandatory debt collection protocols of CCIOA and The Peaks' Governing Documents under which the existence of the alleged debt should have been first disclosed only to Plaintiffs and verified prior to circulation of the Debt Collection Letter; (4) knowingly publishing a series of false and misleading statements regarding Plaintiffs to be published to numerous third parties through the Debt Collection Letter; and (5) refusing to retract or modify the Debt Collection Letter's false

41

and misleading statements despite knowing the $15.5 million claim is baseless and unsupportable.

176.    The false and misleading allegations set forth in the Debt Collection Letter were intentionally circulated by the Defendants to numerous third parties and prominent members of the Telluride business community.

177.    Upon information and belief, members of the POA have further disclosed the Debt Collection Letter's false and misleading allegations to many additional parties beyond the original recipients of the Debt Collection Letter.

178.    Upon information and belief, members of the POA have also disclosed to numerous third parties the false and unreliable positions identified in the Burke Conclusions, including Burke's conclusion that TRS and the individuals associated with it potentially committed "fraud."

179.    Defendants' repeated publications of false and misleading allegations concerning Plaintiffs have resulted in significant harm to Herrick.

180.    Defendants continue to disseminate the false and misleading allegations set forth in the Debt Collection Letter and Burke Conclusions in a manner intended to harm and harass Herrick and the other Plaintiffs.

181.    For example, after publishing the Debt Collection Letter, Brunjes and Bill Jensen, as President of the POA and Chief Executive Officer of TSG, participated in a verbal conversation with a prospective buyer of a penthouse unit in The Peaks.   During this conversation, Brunjes and Jensen represented to the buyer that he would be part of a "windfall" if he purchased a unit in The Peaks because they were going to "squeeze a million dollars" out of Herrick.

182.    Plaintiffs have incurred and continue to incur significant monetary damages as a direct and proximate result of Defendants' conduct.  For example, Plaintiffs were forced to abandon the Bulk Sales Program when Defendants published the Debt Collection Letter, including transmission of the letter to Land Title.  Plaintiffs' attempts to sell their units individually have been rendered impossible as well due to Defendants' refusal to retract the Debt Collection Letter despite knowing the letter is false and misleading.

183.    Herrick's other business interests have also suffered significant harm due to Defendants' systematic and pervasive violations of their legal, contractual, and fiduciary obligations.  Much of Herrick's business is dependent on his ability to obtain financing from financial institutions.  Herrick's ability to obtain financing for these business interests and opportunities has been impeded, as financial institutions and other parties are now reluctant or unwilling to accept personal guarantees from Herrick.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
Violation of the Colorado Common Interest Ownership Act
(Against the POA)

184.    Plaintiffs incorporate by reference all other paragraphs of this Complaint.

185.    The POA is obligated to comply with the Colorado Common Interest Ownership Act's ("CCIOA") due process requirements for imposition of fines and procedures for collection of delinquent accounts, codified at C.R.S. § 38-33.3-209.5.

186.    Every contract or duty governed by the CCIOA "imposes an obligation of good faith in its performance or enforcement."  C.R.S. § 38-33.3-113.

187.    In order to promote responsible governance, the POA is required to maintain "accurate and complete accounting records."  C.R.S. § 38-33.3-209.5(1)(a).

43

188.    Before imposing any fine on a unit owner, the POA must follow a "fair and impartial fact-finding process concerning whether the alleged violation actually occurred and whether the unit owner is the one who should be held responsible for the violation." C.R.S. § 38-33.3-209.5(2)(b)(I).

189.    Before turning over a delinquent account of a unit owner to a collection agency or referring it to an attorney for legal action, the POA is required to send the unit owner a notice of delinquency specifying the "total amount due, with an accounting of how the total was determined." C.R.S. § 38-33.3-209.5(5)(a)(V)(A).

190.    Before turning over a delinquent account of a unit owner to a collection agency or referring it to an attorney for legal action, the POA is required to provide the unit owner, upon the unit owner's request, a "ledger" which may be used "to verify the amount of the debt." C.R.S. § 38-33.3-209.5(5)(a)(V)(C).

191.    The POA has systematically failed to exercise good faith in the performance of the Association's collection policies and circulation of the Debt Collection Letter.  The POA violated CCIOA's good faith requirement by, *inter alia*, commissioning a sham "internal audit" to be performed by TSG; misrepresenting the nature, scope, and findings of Haynie's agreed-upon procedures engagement; failing to provide prior notice to Plaintiffs before broadly publishing the Debt Collection Letter to numerous third parties; failing to participate in any informal discussion with Plaintiffs regarding the alleged unpaid assessments even though Plaintiffs were prominent members of the Association and Herrick continued to serve as a POA director; intentionally failing to disclose the existence of the True-Up Process in the Debt Collection Letter; and refusing to withdraw or modify the Debt Collection Letter despite knowing the letter's allegations and monetary demand is false and misleading.

44

192.    The POA also violated CCIOA through its failure to conduct a fair and impartial fact-finding process to confirm whether TRS's alleged failure to satisfy its assessment obligations actually occurred.   For example, the POA delegated responsibility for the investigation into TRS's alleged failure to satisfy its assessment obligations to TSG despite knowing that TSG was not impartial.   The POA authorized TSG to lead the investigation into whether TRS had properly satisfied its assessment obligations despite knowing that TSG had a significant financial incentive to conclude that TRS owed funds for delinquent assessments.   In addition, the POA violated CCIOA's mandatory requirement that it conduct a fair and impartial fact-finding process when it authorized and then relied on TSG's sham internal audit, and when it manipulated Haynie's agreed-upon procedures engagement in order to control the outcome of Haynie's work.

193.    The POA committed further violations of CCIOA when it authorized its outside counsel to serve as a "debt collector" and broadly circulate the Debt Collection Letter without providing Plaintiffs an accurate ledger and accounting reflecting the amounts of any purportedly unpaid assessments.   The POA has already acknowledged that the $15,521,747 monetary claim and calculation of unpaid assessments that was published through the Debt Collection Letter is false and misleading.   Despite repeated requests from Plaintiffs, and in contravention of CCIOA, the POA has refused to retract the Debt Collection Letter or provide an accurate ledger and accounting identifying the dates and amounts of any assessments that were not properly satisfied under the POA Board-approved True-Up Process at the time.

194.    As a direct and proximate result of the POA's failure to comply with CCIOA, Plaintiffs have suffered, and will continue to suffer, irreparable harm, as well as damages in an amount to be proven at trial.

195.    The POA's CCIOA violations also entitle Plaintiffs to an award of attorneys' fees.

**SECOND CLAIM FOR RELIEF**
Breach of the Governing Documents
(Against the POA)

196.    Plaintiffs incorporate by reference all other paragraphs of this Complaint.

197.    The POA is required to comply with the Peaks Governing Documents, as amended, which include the Original Declaration, the Original Bylaws, and the 2018 Responsible Governance Policies.

198.    The POA breached the terms of the Original Declaration and the Original Bylaws by, *inter alia*, circulating the Debt Collection Letter without maintaining the required books and records relating to the alleged unpaid assessments and by refusing to provide Plaintiffs with a complete, updated, and accurate statement reflecting the amounts and dates of any alleged unpaid assessments.

199.    The POA breached the terms of the 2018 Responsible Governance Policies by, *inter alia*, failing to provide to Plaintiffs an accurate ledger verifying the true and correct amount of any unpaid assessments, failing to act in good faith in carrying out the Association's collection procedure, and publishing the Debt Collection Letter without maintaining sufficiently detailed financial records supporting the alleged amount of unpaid assessments.

200.    Plaintiffs at all times complied with the terms of the Peaks Governing Documents.

201.    As a direct and proximate result of the POA's breaches of the Original Declaration, Original Bylaws, and the 2018 Responsible Governance Policies, Plaintiffs have suffered, and will continue to suffer, irreparable harm, as well as damages in an amount to be proven at trial.

## THIRD CLAIM FOR RELIEF
Breach of the Covenant of Good Faith and Fair Dealing
(Against the POA)

202.    Plaintiffs incorporate by reference all other paragraphs of this Complaint.

203.    The POA is required to comply with and enforce the Peaks Governing Documents, which include the Original Declaration, the Original Bylaws, and the 2018 Responsible Governance Policies.

204.    The Original Declaration, Original Bylaws, and 2018 Responsible Governance Policies confer discretion on the POA in carrying out the duties, responsibilities, and obligations set forth therein.

205.    Through its collection efforts relating to this dispute, the POA has exercised that discretion in a manner inconsistent with Plaintiffs' reasonable expectations.

206.    Plaintiffs at all times complied with the terms of the Peaks Governing Documents.

207.    As a direct and proximate result of the POA's wrongful exercise of its discretion and violation of the duty of good faith and fair dealing, Plaintiffs have suffered, and will continue to suffer, irreparable harm, as well as economic and noneconomic damages in an amount to be proven at trial.

## FOURTH CLAIM FOR RELIEF
Breach of Fiduciary Duty
(Against the POA)

208.    Plaintiffs incorporate by reference all other paragraphs of this Complaint.

209.    The POA owes fiduciary duties to its members.  TRS and HRP are members of the POA to whom fiduciary duties are owed by the Association.

210.    The POA breached its fiduciary duties to TRS and HRP of care, loyalty, impartiality, and good faith by, *inter alia*, authorizing TSG to conduct a sham internal audit;

manipulating the agreed-upon procedures performed by Haynie; knowingly approving the publication of false and misleading statements through the Debt Collection Letter; refusing to retract or modify the Debt Collection Letter despite acknowledging that the letter's calculations of alleged unpaid assessments are inaccurate; and placing TSG's interests above those of the Association's members.

211.    As a direct and proximate result of the POA's breaches of fiduciary duties, TRS and HRP have suffered, and will continue to suffer, irreparable harm, as well as economic and noneconomic damages in an amount to be proven at trial.

**FIFTH CLAIM FOR RELIEF**
Breach of Fiduciary Duty
(Against Brunjes)

212.    Plaintiffs incorporate by reference all other paragraphs of this Complaint.

213.    Brunjes, in his capacities as an officer and director of the POA, owes fiduciary duties to the members of the POA, which include TRS and HRP.

214.    Brunjes, through his position as a director of the POA, also owes fiduciary duties to the other directors on the POA Board, including Herrick.

215.    Brunjes breached his fiduciary duties to Plaintiffs of care, loyalty, and good faith by, *inter alia*, (1) authorizing a sham "internal audit"; (2) manipulating Haynie's "agreed-upon procedures" in order to ensure they would yield false and misleading results; (3) failing to disclose significant events and decisions to Plaintiffs; (4) approving the POA's failure to comply with CCIOA's mandatory debt collection protocol and the protocol required in The Peaks' Governing Documents in order to maximize the harassment of Plaintiffs; (5) knowingly authorizing a series of false and misleading statements regarding Plaintiffs to be circulated to numerous third parties through the Debt Collection Letter; and (6) refusing to authorize the

withdrawal of the $15.5 million monetary demand despite knowing the claims are baseless and unsupportable.

216.     Brunjes breached his fiduciary duties of loyalty and impartiality to Plaintiffs by, *inter alia*, favoring and placing his own interests and those of TSG over the interests of Plaintiffs.

217.     As a direct and proximate result of Brunjes' breaches of fiduciary duties, Plaintiffs have suffered, and will continue to suffer, irreparable harm, as well as economic damages in an amount to be proven at trial.

## SIXTH CLAIM FOR RELIEF
### Breach of Fiduciary Duty
### (Against Peaks Hotel, LLC)

218.     Plaintiffs incorporate by reference all other paragraphs of this Complaint.

219.     Peaks Hotel, LLC serves as managing agent of the POA and the Peaks.

220.     In its role as manager of the POA, Peaks Hotel, LLC is under a duty to act for the benefit of the POA members for all matters falling within the scope of the managing agent relationship.

221.     As manager of the POA, Peaks Hotel, LLC is responsible for, *inter alia*, managing and overseeing the POA's accounting, reporting, and internal controls.  Peaks Hotel, LLC, as manager of the POA, exercises a high degree of control over the property of the POA and its members, thereby creating a relationship of trust, confidence, and reliance between Peaks Hotel, LLC and TRS and HRP, as members of the POA.

222.     TRS and HRP, as members of the POA, placed a high degree of trust and confidence in Peaks Hotel, LLC to act in their best interests.

223.   Peaks Hotel, LLC breached its fiduciary duties of care, loyalty, and impartiality by, *inter alia*, placing TSG's interests above those of TRS and HRP; failing to exercise reasonable care and act in good faith when evaluating and then concluding that TRS and its members had not properly paid assessments; and participating in and enabling the sham internal audit.

224.   As a direct and proximate result of Peaks Hotel, LLC's breaches of its fiduciary duties, TRS and HRP have suffered, and will continue to suffer, irreparable harm, as well as economic and noneconomic damages in an amount to be proven at trial.

225.   TSG is liable for Peaks Hotel, LLC's breaches of fiduciary duty under the equitable doctrine of piercing the corporate veil.

226.   TSG served and continues to serve as the de facto manager of the POA and The Peaks.  TSG holds itself out to the public as the manager of the POA and the Peaks, and the Debt Collection Letter expressly represented that it was published "on behalf of" TSG in TSG's role as "POA Manager."

227.   Peaks Hotel, LLC is a wholly owned subsidiary of TSG.  Peaks Hotel, LLC and TSG have overlapping employees, officers, and/or directors.  The employees, officers, and directors of Peaks Hotel, LLC take direction from TSG and act in TSG's interests.

228.   Upon information and belief, Peaks Hotel, LLC has no independent source of income beyond the fees earned through the AMA and RMA, which is facilitated and made possible through TSG's control of the POA Board.  Peaks Hotel, LLC is merely an alter ego and instrumentality of TSG given the control exercised by TSG over its subsidiary as alleged in this Complaint.  Upon information and belief, Peaks Hotel, LLC does not have significant assets or capitalization.

229.    Acting as the de facto manager of the POA and The Peaks, TSG failed to exercise due care, prudence, good faith, or loyalty to Plaintiffs as members of the Association.  TSG, through its dominance and control over the POA Board and Peaks Hotel, LLC, used its resources and position of control to manipulate the accountings and audit conclusions that served as the basis for the Debt Collection Letter, and enabled knowingly false and misleading statements to be widely circulated through the Debt Collection Letter.

230.    Piercing the corporate veil to hold TSG liable for Peaks Hotel, LLC's breaches of fiduciary duty is necessary here to achieve an equitable result so that TSG may not use the corporate form to shield its improprieties as alleged in this Complaint.

### SEVENTH CLAIM FOR RELIEF
Aiding and Abetting Breach of Fiduciary Duty
(Against TSG)

231.    Plaintiffs incorporate by reference all other paragraphs of this Complaint.

232.    The POA and Peaks Hotel, LLC breached their fiduciary duties of care, loyalty, impartiality, and good faith owed to TRS and HRP, as alleged in this Complaint.

233.    TSG knowingly participated in and encouraged the POA's and Peaks Hotel, LLC's breaches of their fiduciary duties.

234.    TSG affirmatively assisted the POA and Peaks Hotel, LLC in breaching their fiduciary duties, and in doing so enabled the breaches to occur.  TSG, for example, coordinated and led the "internal audit" that served as the basis for the Debt Collection Letter, along with Peaks Hotel, LLC.  TSG is paying the legal and accounting fees associated with the investigation and pursuant of this dispute with TRS as set forth in the Attorney Fee Agreement.  TSG's accountants provided the results of their accounting analysis to the POA, the contents of which TSG and the POA knew presented false and misleading conclusions.

51

235. TSG also controls the POA Board, and TSG's Chief Executive Officer Bill Jensen serves as the Board's President. The Debt Collection Letter was sent "on behalf of" both the POA and TSG, and through publishing the Debt Collection Letter TSG knowingly participated in and encouraged the POA's publication of false and misleading information.

236. TSG knew that the POA and Peaks Hotel, LLC owed fiduciary duties to TRS and HRP, and that the conduct alleged in this Complaint would be a violation of those duties.

237. As a direct and proximate result of TSG's aiding and abetting the breaches of fiduciary duties committed by the POA and Peaks Hotel, LLC, TRS and HRP have suffered, and will continue to suffer, irreparable harm, as well as economic and noneconomic damages in an amount to be proven at trial.

## EIGHTH CLAIM FOR RELIEF
### Slander of Title
### (Against the POA and TSG)

238. Plaintiffs incorporate by reference all other paragraphs of this Complaint.

239. As alleged herein, the POA and TSG knowingly authorized the publication of slanderous and false statements concerning Plaintiffs through the Debt Collection Letter.

240. Through their conduct in authorizing the circulation of the slanderous and false statements in the Debt Collection Letter, the POA and TSG acted with malice to vex, annoy, and/or injure Plaintiffs.

241. As a direct and proximate result of the POA and TSG's conduct, Plaintiffs have incurred and continue to incur special damages, including through Plaintiffs' inability to sell their remaining condominium units in The Peaks and through their attorneys' fees incurred to date in attempting to remove the cloud on their units' title.

2204154

**NINETH CLAIM FOR RELIEF**
Civil Conspiracy
(Against All Defendants)

242.    Plaintiffs incorporate by reference all other paragraphs of this Complaint.

243.    The Defendants had a meeting of the minds and knowingly and willfully conspired and agreed together to implement a scheme intended to coerce Plaintiffs into paying money that Defendants knew was not owed.  Defendants knowingly and willfully agreed and conspired to engage in a scheme to intimidate and harass Plaintiffs, which was accomplished through Defendants' manipulation of accounting information, dissemination of false information concerning Plaintiffs, and refusal to withdraw their monetary demand despite knowing the claim is unsupportable.   Defendants knew and intended that their agreed-upon scheme would irreparably harm Herrick and prevent Plaintiffs' Bulk Sales Program from moving forward.

244.    In furtherance of this agreement, Defendants did, in violation of their duties to Plaintiffs, commit one or more overt and unlawful acts in furtherance of the conspiracy, including but not limited to widely publishing a series of false statements concerning Plaintiffs through the Debt Collection Letter.

245.    As alleged in this Complaint, Defendants acted in a willful and wanton manner through their conduct in knowingly manipulating accounting information and knowingly publishing a false and misleading Debt Collection Letter in order to advance Defendants' improper and unlawful objectives.

246.    As a direct and proximate result of Defendants' civil conspiracy, Plaintiffs have suffered, and will continue to suffer, irreparable harm, as well as economic, non-economic, and exemplary damages in an amount to be proven at trial.  Defendants are jointly and severally liable for Plaintiffs' losses.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs request the following relief:

A.      Judgment in its favor and against Defendants on all claims;

B.      Economic, non-economic, special, and exemplary damages, in an amount to be determined according to proof at trial;

C.      Punitive damages;

D.      Statutory and moratory interest;

E.      Reasonable attorneys' fees and costs; and

F.      Any additional legal or equitable relief that the Court deems just and proper.

## **JURY DEMAND**

Plaintiffs demand a jury on all issues so triable.

Dated this 12th day of February, 2020.

　　　　　　　　　　　　　 *s/ Daniel M. Reilly*　　　　　
　　　　　　　　　　　　 Daniel M. Reilly
　　　　　　　　　　　　 Clare S. Pennington
　　　　　　　　　　　　 Michael P. Robertson
　　　　　　　　　　　　 Reilly Pozner LLP
　　　　　　　　　　　　 1700 Lincoln Street, Suite 2400
　　　　　　　　　　　　 Denver, CO 80203

　　　　　　　　　　　　 *Attorneys for Plaintiffs*

Plaintiff's Address:　　 117 North Aspen Street
　　　　　　　　　　　　 Telluride, Colorado 81435

2204154