**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**Senior Judge Christine M. Arguello**

Civil Action No. 21-cv-01873-CMA-SP

NEW HAMPSHIRE INSURANCE COMPANY, and
NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA,

     Plaintiffs/Counter Defendants,

v.

TSG SKI & GOLF, LLC,
THE PEAKS OWNERS ASSOCIATION, INC.,
PEAKS HOTEL, LLC, and
H. CURTIS BRUNJES,

     Defendants/Counter Claimants.

---

**ORDER GRANTING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

---

This matter is before the Court on Plaintiffs New Hampshire Insurance Company ("New Hampshire") and National Union Fire Insurance Company of Pittsburgh, PA's ("National Union") Motion for Summary Judgment. (Doc. # 102.) For the following reasons, the Court grants the Motion and enters summary judgment in favor of Plaintiffs.

## I.     **BACKGROUND**

This is a declaratory judgment action regarding insurance coverage. Unless otherwise indicated, the following material facts are undisputed.

A.     **THE INSURANCE POLICIES**

Defendants TSG Ski & Golf, LLC ("TSG"), The Peaks Owners Association ("POA"), and Peaks Hotel, LLC ("Peaks Hotel") were all insureds under a series of commercial general liability coverage policies issued by Plaintiffs New Hampshire and National Union for the consecutive periods November 1, 2017, through November 1, 2020.[1] (Doc. ## 102-9, 102-10, 102-22.) The New Hampshire Policies provide:

1.  Insuring Agreement

     a.  We will pay those sums that the insured becomes legally obligated to pay as damages because of "personal and advertising injury" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "personal and advertising injury" to which this insurance does not apply.

(Doc. # 102-9 at 296.) The New Hampshire Policies provide the following definition of "personal and advertising injury":

14. "Personal and advertising injury" means injury, including consequential "bodily injury", arising out of one or more of the following offenses:

     . . .

     d.  Oral or written publication, in any manner, of material that slanders or libels a person or organization or disparages a person's or organization's goods, products, or services.

---

[1] During that time frame, New Hampshire issued Policy No. 01-LX-011738646-5, Policy No. 01-LX-011738646-6, and Policy No. 01-LX-011738646-7 to Defendants. (Doc. # 109 at 3.) The terms and conditions of the New Hampshire Policies are substantively the same. Similarly, National Union issued Policy No. 29-UD-042864208-5, Policy No. 29-UD-42864208-6, and Policy No. 29-UD-042864208-7, the terms and conditions of which are substantively the same. (*Id.*)

(*Id.* at 305.) Although the New Hampshire Policies provide insurance coverage for libel and disparagement claims, the Policies exclude coverage for injuries arising from "Material Published with Knowledge of Falsity." The exclusion provides that there is no insurance coverage for:

> "Personal or advertising injury" arising out of oral or written publication, in any manner, of material, if done by or at the direction of the insured with knowledge of its falsity.

(*Id.* at 296.)

The National Union Policies also provide coverage for damages for liability because of "Personal Injury and Advertising Injury":

> A. We will pay on behalf of the **Insured** those sums in excess of the **Retained Limit** that the **Insured** becomes legally obligated to pay as damages by reason of liability imposed by law because of . . . **Personal Injury and Advertising Injury** to which this insurance applies. . . .

(Doc. # 102-11 at 121.) The National Union Policies define "Personal Injury and Advertising Injury" as:

> [I]njury arising out of your business, including consequential **Bodily Injury**, arising out of one or more of the following offenses:
>
> . . .
>
> 4.  oral or written publication, in any manner, of material that slanders or libels a person or organization, or disparages a person's or organization's goods, products or services.

(*Id.* at 142.) Like the New Hampshire Policies, the National Union Policies exclude coverage for damages arising from publication of information that an insured knows is false:

**U.  Various Personal Injury and Advertising Injury**

This insurance does not apply to **Personal Injury and Advertising Injury**:

. . .

> 2. arising out of oral, written or electronic publication, in any manner, of material if done by or at the direction of any **Insured** with knowledge of its falsity. . . .

(*Id.* at 132.)

Because the provisions in the New Hampshire and National Union Policies are substantially similar, the Court will collectively refer to the exclusions as the "Knowledge of Falsity Exclusions."

**B.   THE UNDERLYING LAWSUIT**

This action relates to case captioned *Peaks Capital Partners, LLC et al. v. H. Curtis Brunjes et al.*, Case No. 2019CV30047, pending in Colorado District Court for the County of San Miguel ("Underlying Lawsuit"). *See* (Doc. # 77-1.) Non-parties Peaks Capital Partners, LLC, Telluride Resort & Spa, LLC ("TRS"), Highlands Resorts at the Peaks; Edward D. Herrick ("Ted Herrick"); and Edward D. Herrick, Jr. ("Todd Herrick") (collectively, "Underlying Plaintiffs") filed the Underlying Lawsuit alleging that Defendants TSG, Peaks Hotel, the POA, and H. Curtis Brunjes caused financial harm to Underlying Plaintiffs by coercing them to pay owners' association assessments they did not owe. (*Id.*) Defendants in this action are also Defendants in the Underlying Case.

1.   <u>The Underlying Complaints</u>

In their First, Second, Third, Fourth, and Fifth Amended Complaints ("Underlying Complaints"), Underlying Plaintiffs allege that Defendants circulated a debt collection

letter in March 2019 stating that Underlying Plaintiffs owed Defendants more than $15.5 million in unpaid assessments imposed by the POA for condominiums owned at The Peaks in Mountain Village, Colorado ("Debt Collection Letter").[2] (Docs. ## 77-1 at ¶ 10; 77-2 at ¶ 10; 77-3 at ¶ 11; 77-4 at ¶ 11; 77-5 at ¶ 11.) The Underlying Complaints allege, however, that Underlying Plaintiff TRS had paid assessments imposed by the POA using an agreed upon "true-up" process, by which the POA would deduct TRS's expense payments from TRS's assessments due, and TRS would pay the balance of its assessments, less the expense payments. (Docs. ## 77-1 at ¶¶ 3, 43–45; 77-2 at ¶¶ 3, 44–46; 77-3 at ¶¶ 3, 46–48; 77-4 at ¶¶ 3, 46–48; 77-5 at ¶¶ 45–47.) The Underlying Complaints allege that Defendants knew that TRS satisfied its assessment obligations by paying expenses and using the true-up process. (Docs. ## 77-1 at ¶ 5; 77-2 at ¶ 5; 77-3 at ¶ 6; 77-4 at ¶ 6; 77-5 at ¶ 6.)

The Underlying Complaints allege that Defendants implemented a scheme to coerce Underlying Plaintiffs to pay amounts they did not owe, first by commissioning a sham "internal audit" performed by an accountant employed by TSG. (Docs. ## 77-1 at ¶ 6; 77-2 at ¶ 6; 77-3 at ¶ 7; 77-4 at ¶ 7; 77-5 at ¶ 7.) They allege that Defendants next retained an accounting firm to evaluate the assessments that TRS paid. (Doc. ## 77-1 at ¶ 7; 77-2 at ¶ 7; 77-3 at ¶ 8; 77-4 at ¶ 8; 77-5 at ¶ 8.) According to the Underlying Complaints, Defendants intentionally manipulated these accounting procedures by limiting the accountant's work to identifying assessments TRS paid directly into the

---

[2] Peaks Capital Partners, LLC and Highlands Resort at the Peaks were not included as named plaintiffs in the Fifth Amended Complaint.

POA's bank accounts, which yielded false and misleading results regarding TRS's assessment payments. (*Id.*) The Underlying Complaints allege that Defendants knew the accountant's findings were false and misleading because TRS had paid assessments through the true-up process and paying expenses, which heavily offset the amount TRS was obligated to pay directly into the POA's bank accounts. (Docs. ## 77-1 at ¶ 125; 77-2 at ¶ 129; 77-3 at ¶ 139; 77-4 at ¶ 148; 77-5 at ¶ 141.)

The Underlying Complaints allege that on March 21, 2019, Defendants circulated the Debt Collection Letter in which they claimed that Plaintiffs owed more than $15.5 million in unpaid assessments. (Docs. ## 77-1 at ¶¶ 10, 12; 77-2 at ¶¶ 10, 12; 77-3 at ¶¶ 11, 13; 77-4 at ¶¶ 11, 13; 77-5 at ¶¶ 11, 13.) The letter failed to acknowledge that TRS had paid assessments through the true-up process. (*Id.*) The Underlying Complaints allege that at the time Defendants broadly published the Debt Collection Letter, they knew that the letter's calculation of allegedly unpaid assessments was false and misleading. (*Id.*) Moreover, the Underlying Complaints allege that Defendants intentionally circulated the false and misleading statements in the Debt Collection Letter to third parties to coerce Underlying Plaintiffs to make further payments they did not owe. (Docs. ## 77-1 at ¶¶ 11–12, 12; 77-2 at ¶¶ 11–12; 77-3 at ¶¶ 12–13; 77-4 at ¶¶ 12–13; 77-5 at ¶¶ 12–13.)

Underlying Plaintiffs allege that the publication of the false and misleading statements in the Debt Collection Letter caused them significant monetary harm. The Fifth Amended Complaint asserts claims for relief (1) against the POA for violation of the Colorado Common Interest Ownership Act ("CCIOA"), Colo. Rev. Stat. § 38-33.3-

101, *et seq.*; (2) against the POA for Breach of Fiduciary Duty; (3) against Mr. Brunjes for Breach of Fiduciary Duty; (4) against Peaks Hotel for Breach of Fiduciary Duty; (5) against TSG for Aiding and Abetting Breach of Fiduciary Duty; (6) against all Defendants for Civil Conspiracy; (7) against TSG for Breach of Fiduciary Duty, in the alternative to the Sixth Claim for Relief; and (8) against all Defendants for Negligence.[3] (Doc. # 77-5.)

    2.   <u>The Trial</u>

Trial took place in the Underlying Lawsuit in San Miguel County from June 6 to June 17, 2022. (Doc. # 109 at 3.) At trial, Defendants' testimony established that they knew that the Debt Collection Letter falsely stated that Underlying Plaintiffs owed $15,521,747. The testimony showed that Defendants knew that Underlying Plaintiffs had made assessment payments through the true-up process, which reduced the total amount of assessments owed, and that the $15.5 million amount was therefore false. For example, Defendant Mr. Brunjes, a POA board member, testified that he participated in approving TRS true-ups from 2009 to 2015 and that he knew, with respect to the Debt Collection Letter, that "the total amount due would not be $15 million, that there would be an offset." (Doc. # 102-4 at 5–8; 69.) Similarly, Tom Richards, another POA board member and TSG's CFO at the time the Debt Collection Letter was published, testified that he knew about TRS's assessment payments using the true-up process. (Doc. # 102-5 at 13–14, 15.) Mr. Richards stated that he knew,

---

[3] The First, Second, and Third Amended Complaints also contained a claim for slander of title. (Docs. ## 77-1; 77-2; 77-3.) In the Fourth and Fifth Amended Complaints, Underlying Plaintiffs added a cause of action for negligence against Defendants. (Docs. ## 77-4; 77-5.)

when he approved the Debt Collection Letter, that the letter did not account for any assessments that were satisfied under the true-up process. (*Id.* at 40.)

Underlying Plaintiffs testified that their damages arose out of the publication of the Debt Collection Letter. (Doc. # 102-1 at 5, 12, 43.) For example, Ted Herrick testified that the Debt Collection Letter had a "significant impact" on his business and related important relationships. (*Id.*)

On June 17, 2022, the jury entered a verdict in favor of Underlying Plaintiffs and awarded them $225,000 in damages. (Doc. # 102-7.) The jury found (1) the POA liable for breach of fiduciary duty, negligence, civil conspiracy, and breach of the CCIOA; (2) Mr. Brunjes liable for breach of fiduciary duty and negligence; and (3) TSG liable for breach of fiduciary duty, aiding and abetting breach of fiduciary duty, negligence, and civil conspiracy.[4] (*Id.*) The jury declined to award any punitive damages. (*Id.*) Because the jury found that the POA breached the CCIOA, the trial court found that Underlying Plaintiffs were entitled to their attorney fees. (Doc. # 102-8 at 2.) At the time of Plaintiffs' Motion for Summary Judgment, the court had not yet determined the amount of the attorney fee award. (Doc. # 102 at 7–8.)

## C. PROCEDURAL HISTORY

Plaintiffs New Hampshire and National Union initiated the instant lawsuit on July 9, 2021. (Doc. # 1.) In their Second Amended Complaint, they seek a declaratory judgment that they owe no duty to defend and no duty to indemnify Defendants in the Underlying Lawsuit because of the Knowledge of Falsity Exclusions in the New

---

[4] Peaks Hotel was dismissed as a defendant prior to trial. (Doc. # 102 at 5 n.2.)

Hampshire and National Union Policies. (Doc. # 77.) According to Plaintiffs, New Hampshire advised Defendants that the Underlying Lawsuit was not a covered claim, but nevertheless agreed to defend Defendants subject to a reservation of New Hampshire's right to seek reimbursement of defense costs. (Doc. # 102 at 10.) Defendants filed Counterclaims against Plaintiffs alleging (1) breach of contract; (2) bad faith breach of insurance contract; and (3) statutory unreasonable delay or denial of insurance benefits pursuant to Colo. Rev. Stat. §§ 10-3-1115 and -1116. (Doc. # 95.)

On November 11, 2022, Plaintiffs filed the instant Motion for Summary Judgment. (Doc. # 102.) Therein, Plaintiffs request that the Court enter summary judgment in their favor and against Defendants on Plaintiffs' claim for declaratory relief and on Defendants' counterclaims. (*Id.* at 20.) Defendants filed a Response (Doc. # 109), and Plaintiffs followed with their Reply (Doc. # 113). The matter is now ripe for review.

## II.     LEGAL STANDARD

Summary judgment is warranted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it is essential to the proper disposition of the claim under the relevant substantive law. *Wright v. Abbott Labs., Inc.*, 259 F.3d 1226, 1231–32 (10th Cir. 2001). A dispute is "genuine" if the evidence is such that it might lead a reasonable jury to return a verdict for the nonmoving party. *Allen v. Muskogee, Okla.*, 119 F.3d 837, 839 (10th Cir. 1997). When reviewing a motion for summary judgment, a court must view the evidence in the light most favorable to the non-moving party. *See id.* However, conclusory statements based merely on conjecture,

speculation, or subjective belief do not constitute summary judgment evidence. *Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004).

The moving party bears the initial burden of demonstrating the absence of a genuine dispute of material fact and entitlement to judgment as a matter of law. *Id.* In attempting to meet this standard, a movant who does not bear the ultimate burden of persuasion at trial does not need to disprove the other party's claim; rather, the movant need simply point out to the Court a lack of evidence for the other party on an essential element of that party's claim. *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 671 (10th Cir. 1998) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)).

Once the movant has met its initial burden, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). The nonmoving party may not simply rest upon its pleadings to satisfy its burden. *Id.* Rather, the nonmoving party must "set forth specific facts that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant." *Adler*, 144 F.3d at 671. Stated differently, the party must provide "significantly probative evidence" that would support a verdict in his favor. *Jaramillo v. Adams Cnty. Sch. Dist. 14*, 680 F.3d 1267, 1269 (10th Cir. 2012). "To accomplish this, the facts must be identified by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein." *Adler*, 144 F.3d at 671.

### III.  DISCUSSION

Plaintiffs argue that they are entitled to summary judgment because the Knowledge of Falsity Exclusions in the New Hampshire and National Union Policies

preclude both a duty to defend against the Underlying Complaints and a duty to indemnify Defendants for the judgment in the Underlying Lawsuit. (Doc. # 102 at 11.) The Court agrees with Plaintiffs.

## A.   APPLICABLE LAW

In a diversity case such as this, the Court applies Colorado law and interprets insurance policies as a Colorado court would. *Leprino Foods Co. v. Factory Mut. Ins. Co.*, 453 F.3d 1281, 1286 (10th Cir. 2006). Under Colorado law, "[i]nsurance policies are subject to contract interpretation." *Bailey v. Lincoln Gen. Ins. Co.*, 255 P.3d 1039, 1050 (Colo. 2011). In interpreting a contract, the court must "give effect to the intent and reasonable expectations of the parties." *Thompson v. Maryland Cas. Co.*, 84 P.3d 496, 501 (Colo. 2004). As such, insurance policies "must be given effect according to the plain and ordinary meaning of their terms." *Bailey*, 255 P.3d at 1051 (quoting *Terranova v. State Farm Mut. Auto. Ins. Co.*, 800 P.2d 58, 59 (Colo. 1990) (emphasis removed)).

In Colorado, "an insurer's duty to defend is broader than the duty to indemnify. If there is no duty to defend, there is no duty to indemnify." *Zurich Am. Ins. Co. v. O'Hara Regional Center for Rehabilitation*, 529 F.3d 916, 920–21 (10th Cir. 2008); *see Cyprus Amax Minerals Co. v. Lexington Ins. Co.*, 74 P.3d 294, 299 (Colo. 2003) ("Because the duty to defend encompasses any potential claims raised by the facts and the duty to indemnify relates to the actual liability imposed, this court has considered the duty to defend to be a broader concept than the duty to indemnify."). When determining whether a duty to defend exists, a court must "look no further than the four corners of the underlying complaint." *Cyprus*, 74 P.3d at 299. An insurer's duty to defend arises

11

when the complaint against the insured "alleges any facts that might fall within the coverage of the policy," even if the allegations only "potentially or arguably" fall within the policy's coverage. *Hecla Mining Co. v. New Hampshire Ins. Co.*, 811 P.2d 1083, 1089 (Colo. 1991). When all the elements of a claim covered by a policy are alleged, an insurer has a duty to defend its insured, even if a claim is not labeled according to the terms used in the policy. *Thompson*, 84 P.3d at 502. Once the duty to defend has been established, then the insurer must defend its insured unless an exclusion in the insurance policy precludes coverage. *Hecla*, 811 P.2d at 1090.

When an insurer seeks to limit or exclude coverage under the terms of an insurance policy, the insurer bears the burden of proving that a particular loss falls within an exclusion in the policy. *Colo. Intergovernmental Risk Sharing Agency v. Northfield Ins. Co.*, 207 P.3d 839, 842 (Colo. App. 2008). If an insurer shows that an exclusion applies, the burden then shifts back to the insured to prove the applicability of an exception to the exclusion. *See Leprino Foods*, 453 F.3d at 1287. "Any exclusion must be clear and specific to be enforceable." *Id.* (quoting *Fire Ins. Exchange v. Bentley*, 953 P.2d 1297, 1301 (Colo. App. 1998)).

## B.    DUTY TO DEFEND

Plaintiffs concede that the facts alleged in the Underlying Complaints adequately establish claims for "personal and advertising injury" sufficient to trigger coverage under the Policies. (Doc. # 102 at 11–12.) However, Plaintiffs contend that the Knowledge of Falsity Exclusions preclude coverage because the Underlying Complaints also allege that Defendants knowingly made a false statement in the Debt Collection Letter that

Underlying Plaintiffs owed approximately $15.5 million in unpaid assessments. (*Id.* at 12–13.) Each of the Underlying Complaints specifically allege that "at the time [Defendants] published the Debt Collection Letter, they knew that the letter's calculation of allegedly unpaid assessments was false and misleading." (Docs. ## 77-1 at ¶¶ 10–11; 77-2 at ¶¶ 10–11; 77-3 at ¶¶ 11–12; 77-4 at ¶¶ 11–12; 77-5 at ¶¶ 11–12.) The Underlying Complaints further allege that Defendants knew that the statement regarding unpaid assessment was false because Defendants knew that TRS had satisfied its assessment obligations using the true-up process. (*Id.*) The Court agrees with Plaintiffs that these factual allegations are sufficient to trigger the Knowledge of Falsity Exclusions, which preclude coverage for "'personal and advertising injury" arising out of written publication of material by or at the direction of the insureds "**with knowledge of its falsity**." (Doc. # 102-9 at 296; Doc. # 102-11 at 132) (emphasis added).

Defendants raise several arguments as to why the Knowledge of Falsity Exclusions do not indisputably take the underlying claims out of coverage. (Doc. # 109 at 11.) First, Defendants point to the claims brought by Underlying Plaintiffs Todd and Ted Herrick and argue that "[n]owhere in the pleadings . . . was there an allegation that the Herricks—as opposed to TSR—had paid any assessments through the true-up process." (*Id.* at 12.) As such, Defendants argue that there is no allegation in the Underlying Complaints that Defendants "knew that any amounts the Herricks were alleged to have owed was false." (*Id.*) According to Defendants, the Herricks' claims are therefore not premised on any factual allegations of "knowledge of falsity" with respect to the assessments that they (or either of them) supposedly owed.

The Court disagrees with Defendants that the Herricks' claims are "not premised on any factual allegations of 'knowledge of falsity'" merely because the Underlying Complaints do not allege that the Herricks' assessments were not satisfied through the true-up process. The Underlying Complaints allege:

> The Debt Collection Letter threatened to foreclose on the condominium units owned by TRS, HRP, and others through "the commencement of a lawsuit against TRS, PCP," and other parties, "including principals of [these] entities." The Debt Collection Letter identified both Todd and Ted Herrick by name as being principals of PCP and TRS.

(Doc. # 77-2 at ¶ 136).[5] The Underlying Complaints further allege that the Herricks were injured by the false statement in the Debt Collection letter that TRS owed approximately $15.5 million in unpaid assessments. For example, the Underlying Complaints allege that "Plaintiffs have incurred and continue to incur significant monetary damages as a direct and proximate result of Defendants' conduct," including that "Plaintiffs' attempts to sell their units individually have been rendered impossible . . . due to Defendants' refusal to retract the Debt Collection Letter despite knowing the letter is false and misleading." (*Id.* at ¶ 28.) Each claim for relief in the Underlying Complaints specifically attributes Underlying Plaintiffs' injuries to Defendants knowingly publishing false statements in the Debt Collection Letter. *See, e.g.*, (Doc. ## 77-5 at ¶¶ 229, 231, 234, 236, 238, 241, 244, 255, 257, 260–61, 264–67.) Based on these allegations, the Court finds that the Underlying Complaints adequately allege that the

---

[5] The other Underlying Complaints contain identical or substantially similar language. *See* (Docs. ## 77-1 at ¶ 132; 77-3 at ¶ 159; 77-4 at ¶ 159; 77-5 at ¶ 148.)

Herricks' claims also arise from Defendants' false statement in the Debt Collection Letter concerning unpaid assessments by TRS.

Next, Defendants argue that that several claims asserted in the Underlying Complaints, including slander of title, libel, disparagement, and negligence, are "not dependent upon knowledge of falsity" and therefore should not be precluded from coverage. (Doc. # 109 at 12.) Defendants contend that the policies indisputably provide coverage for these claims because the claims do not "require proof that the defendant knows the actionable statement is false." (*Id.*) The Court is unpersuaded that certain claims may sidestep the Knowledge of Falsity Exclusions merely because those claims do not themselves require proof of a knowingly false statement. In *Thompson*, the Colorado Supreme Court considered whether a "knowledge-of-falsity exclusion provision" would preclude coverage for a disparagement claim, which otherwise triggered coverage and did not require as an element that the defendant "knew the statement was false when he made it." 84 P.3d at 507–08. The court observed that for a disparagement claim, "a person may make statements that are intended to harm without knowing that the statements are false." (*Id.* at 508.) Nevertheless, after reviewing the complaint as a whole, the court determined that the complaint alleged that the defendant knew that the statement was false and therefore coverage was precluded by the knowledge of falsity exclusion provision. *Id.* This Court agrees with the Colorado Supreme Court's logic in *Thompson* and finds that the extensive allegations in the Underlying Complaints relating to Defendants' knowing false statement in the Debt Collection Letter trigger the Knowledge of Falsity Exclusions and bar coverage for

Underlying Plaintiffs' claims against Defendants arising from the Debt Collection Letter. *See also Aim High!, Inc. v. Hartford Fire Ins. Co.*, No. 09-cv-02542-REB-MJW, 2010 WL 4977850 (D. Colo. Dec. 2, 2010) (finding that a knowledge of falsity exclusion in an insurance policy served to bar coverage for a breach of contract claim "[g]iven the pervasive allegations of knowing falsity" in the underlying suit). Because each of Underlying Plaintiffs' claims "arise out of" the publication of the Debt Collection Letter and the knowing false statement made therein, coverage for any of those claims is precluded by the Knowledge of Falsity Exclusions.

Lastly, Defendants argue that the Underlying Complaints do not adequately allege that Defendants "knowingly" made a false statement because "*when*" Defendants became aware that Underlying Plaintiffs did not owe $15.5 million "is not clearly and definitively specified in the pleadings." (Doc. # 109 at 13.) The Court finds this argument to be without merit. The Underlying Complaints allege that Defendants circulated the Debt Collection Letter on March 19, 2021, and "at the time [Defendants] published the Debt Collection Letter, they knew that the letter's calculation of allegedly unpaid assessments was false and misleading." (Docs. ## 77-1 at ¶¶ 10–11; 77-2 at ¶¶ 10–11; 77-3 at ¶¶ 11–12; 77-4 at ¶¶ 11–12; 77-5 at ¶¶ 11–12.) The Underlying Complaints are also replete with allegations that Defendants were aware of the true-up process for years prior to circulating the Debt Collection Letter and therefore knew that the statements in the Debt Collection Letter were false when it was issued.

For these reasons, the Court concludes that the Knowledge of Falsity Exclusions preclude coverage for any claims in the Underlying Lawsuit arising from the publication

of the Debt Collection Letter. Accordingly, the Court finds that Plaintiffs have no duty to

defend Defendants with respect to the Underlying Lawsuit.

## C.  DUTY TO INDEMNIFY

"The duty to indemnify arises only when the policy actually covers the harm and

typically cannot be determined until the resolution of the underlying claims." *Cyprus*, 74

P.3d at 301; *see Hecla*, 811 P.2d at 1086 (concluding that the issue of indemnification

was not ripe for resolution until liability was actually determined). In *Cyprus*, the

Colorado Supreme Court explained:

> When the facts pled, claims asserted and relief sought do arguably include
> a loss for which an insured would potentially be liable, that cannot be the
> end of the inquiry. Rather, at that point, the court must look to the facts as
> they developed at trial and the ultimate judgment. The jury's verdict form
> may break out specific claims and the verdict attributable to those claims.
> If there are various claims and the verdict does not separate them, the trial
> court making the indemnity determination may have to look at the facts
> presented at trial.

74 P.3d at 301.

In the instant case, the Court has already found that the Knowledge of Falsity

Exclusions in the New Hampshire and National Union Policies preclude coverage for

the harm alleged by Underlying Plaintiffs. However, even if "the facts pled, claims

asserted and relief sought" did arguably include a loss covered by the Policy and not

subject to any exclusion, the Court would find that Plaintiffs have no duty to indemnify

Defendants for the judgment entered against them in the Underlying Lawsuit. As recited

above, the evidence presented at trial established that Defendants knew that Underlying

Plaintiffs did not owe $15.5 million in unpaid assessments at the time Defendants

published the Debt Collection Letter. *See* (Doc. # 102-4 at 5–8; 69; Doc. # 102-5 at 13–

15, 40.) Given Mr. Brunjes's and Mr. Richards's uncontroverted testimony that they knew about the true-up process and they knew that $15.5 million was an incorrect amount at the time the Debt Collection Letter was published, the Court finds that Defendants knowingly made a false statement when they circulated the Debt Collection Letter asserting that Underlying Plaintiffs owed more than $15.5 million in unpaid assessments. *See, e.g.*, *In re Stat-Tech Sec Litig.*, 905 F. Supp. 1416, 1422 (D. Colo. 1995) ("Generally, the acts and knowledge of an agent are imputed to the principal. Because a corporation can act only through its agents, the rule is that the actions of corporate officers and directors are attributable to the corporate entity."). The Knowledge of Falsity Exclusions were therefore undoubtedly triggered by the evidence presented at trial.

Defendants ask the Court to look instead at the verdict forms, which show that the jury found TSG liable for breach of fiduciary duty, aiding and abetting breach of fiduciary duty, and negligence, and the POA and Brunjes liable on the latter two claims. (Doc. # 109 at 16.) Defendants argue that "none of the elements of [these claims] required the jury to find that false statements were made, let alone that anyone had knowledge of such falsity." (*Id.*) However, the Court is not at liberty to ignore the trial testimony and the facts developed by the record. *See Cyprus*, 74 P.3d at 301 (in determining whether a duty to indemnify exists, "the court must look to the facts as they developed at trial and the ultimate judgment"). Moreover, regardless of the elements of the claims, each of Underlying Plaintiffs' claims arose from Defendants' circulation of the Debt Collection Letter. After carefully reviewing the facts in this case, the trial

testimony, and the judgment, the Court is satisfied that coverage for the judgment of the Underlying Lawsuit is precluded by the Knowledge of Falsity Exclusions.

The Court is also unpersuaded by Defendants' argument that the jury's refusal to award punitive damages demonstrates that the jury found that Defendants did not knowingly make a false statement. (Doc. # 109 at 16.) Defendants provide no authority for this argument, and the Court does not agree that the jury's choice to not award punitive damages necessarily means that the jury found that Defendants did not knowingly make a false statement. As Defendants state, the jury's decision to not award punitive damages demonstrates that the jury found that Defendants "did not act fraudulently, maliciously, or in a willful and wanton manner." (*Id.*) Applying this standard for punitive damages, the Court finds that the jury could have easily determined that Defendants knowingly made a false statement *and* that their conduct was not fraudulent, malicious, willful, or wanton such to warrant punitive damages. The jury's choice to not award punitive damages simply does not mandate the conclusion that the jury definitively believed that Defendants did not make a knowing false statement.

Because evidence at trial established that Defendants knowingly made a false statement in the Debt Collection Letter, the Court finds that the Policies preclude any duty by Plaintiffs to indemnify Defendants for the judgment in the Underlying Lawsuit.

## D.    ATTORNEY FEES FOR CCIOA CLAIM

The parties also dispute whether Plaintiffs are required to cover the attorney fees award in the Underlying Lawsuit for the POA's violation of the CCIOA. Because the Court concludes that Plaintiffs are not obligated to defend or indemnify Defendants with

respect to the Underlying Lawsuit, the Court need not address the parties' arguments concerning the attorney fee award. No coverage is available for the fee award, just as no coverage is available for the judgment in the Underlying Lawsuit.

## E.   DEFENDANTS' COUNTERCLAIMS

Lastly, the Court agrees with Plaintiffs that because the Knowledge of Falsity Exclusions preclude coverage with respect to the Underlying Lawsuit, Plaintiffs are also entitled to summary judgment on Defendants' counterclaims for breach of contract and bad faith. *See, e.g.*, *MarkWest Hydrocarbon, Inc. v. Liberty Mut. Ins. Co.*, 558 F.3d 1184, 1192 (10th Cir. 2009) ("It is settled law in Colorado that a bad faith claim must fail if, as is the case here, coverage was properly denied and the plaintiff's only claimed damages flowed from the denial of coverage.").

## IV.   <u>CONCLUSION</u>

For the foregoing reasons, the Court ORDERS that Plaintiffs New Hampshire Insurance Company and National Union Fire Insurance Company of Pittsburgh, PA's Motion for Summary Judgment (Doc. # 102) is GRANTED.

The Court finds that:

1.  The New Hampshire and National Union Policies expressly preclude coverage for loss relating to Underlying Plaintiffs' claims and damages because those claims arise from Defendants' knowing false statement in the Debt Collection Letter.

2.  Defendants are not entitled to defense or indemnity under the New Hampshire or National Union Policies for the injuries and damages claimed

by Underlying Plaintiffs in the lawsuit captioned *Peaks Capital Partners, LLC et al v. H. Curtis Brunjes et al.*, Case No. 2019CV30047 in the Colorado District Court for the County of San Miguel.

3. Plaintiff New Hampshire is entitled to reimbursement from Defendants for all amounts New Hampshire paid to defend against the Underlying Lawsuit, plus interest. Within fourteen (14) days of the date of this Order, New Hampshire is directed to file a motion for entry of judgment with supporting documentation outlining the amounts for which it seeks reimbursement in relation to the Underlying Lawsuit.

DATED:  May 17, 2023

BY THE COURT:

CHRISTINE M. ARGUELLO
Senior United States District Judge