FILED
**United States Court of Appeals**
**Tenth Circuit**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

**February 24, 2025**

**Christopher M. Wolpert**
**Clerk of Court**

———————————————

NEW HAMPSHIRE INSURANCE
COMPANY; NATIONAL UNION FIRE
INSURANCE COMPANY OF
PITTSBURGH, PA,

       Plaintiffs-Counter-Defendants-
       Appellees,

v.

No. 23-1248

TSG SKI & GOLF, LLC; THE PEAKS
OWNERS ASSOCIATION, INC.; PEAKS
HOTEL, LLC; H. CURTIS BRUNJES,

       Defendants-Counterclaimants-
       Appellants.

———————————————

**Appeal from the United States District Court**
**for the District of Colorado**
**(D.C. No. 1:21-CV-01873-CMA-SBP)**

———————————————

Bradley A. Levin (Kerri J. Anderson with him on the briefs) of Levin Sitcoff Waneka PC,
Denver, Colorado, for Defendants-Counterclaimants-Appellants.

Agelo L. Reppas (Mark A. Deptula with her on the brief) of BatesCarey LLP, Chicago,
Illinois, for Plaintiffs-Counter-Defendants-Appellees.

———————————————

Before **HARTZ**, **KELLY**, and **FEDERICO**, Circuit Judges.

———————————————

**HARTZ**, Circuit Judge.

———————————————

This appeal presents a dispute over liability-insurance coverage. The issues arise from exclusions in the insurance policies that foreclose both providing a defense and indemnity coverage if the insureds are sued for defamatory or disparaging statements when the insureds have knowledge of the falsity of the statements. Following Colorado precedent, we hold that even though the claims against the insureds did not require proof that the alleged false statements were made knowingly, the knowledge-of-falsity exclusions preclude defense coverage because the underlying complaint alleged that the insureds knowingly published the false statements. And we hold that the exclusions preclude indemnity coverage because the evidence at the underlying trial established that the insureds knowingly published the false statements.

## I.  BACKGROUND

### A.  The Policies

TSG Ski & Golf, LLC (TSG) was insured under commercial general-liability insurance policies issued by New Hampshire Insurance Company (New Hampshire), its primary liability insurer, and National Union Fire Insurance Company of Pittsburgh, P.A. (National Union), its excess-liability insurer (together the Insurers).[1] Both policies included The Peaks Owners Association, Inc. (the POA) and Peaks Hotel, LLC as named insureds by endorsement.

---

[1] The Insurers each issued an initial policy for 2017–2018 and then renewed the policies with no relevant changes for the following two years. In this opinion we reference only the initial policies.

2

The policies provided coverage for sums the insureds became obligated to pay as damages because of personal and advertising injury, which both policies defined as:

> [I]njury . . . arising out of one or more of the following offenses:
>
> > Oral or *written publication*, in any manner, of material that slanders or *libels* a person or organization or *disparages* a person's or organization's goods, products or services[.]

Aplt. App., Vol. VII at 1955 (emphasis added); *see* Vol. IX at 2514.

But both policies excluded coverage for personal and advertising injury arising out of the publication of material the insureds knew to be false. The New Hampshire policy barred coverage for "'Personal and advertising injury' *arising out of* oral or *written publication*, in any manner, of material, if *done by* or at the direction of *the insured with knowledge of its falsity*." Aplt. App., Vol. VII at 1946 (emphasis added). And, in almost identical language, the National Union policy did not apply to "'Personal Injury and Advertising Injury' . . . *arising out of* oral, *written or electronic publication*, in any manner, of material if *done by* or at the direction of *any Insured with knowledge of its falsity*[.]" Aplt. App., Vol. IX at 2504 (emphasis added).

The New Hampshire policy included a "duty to defend" the insureds against any lawsuit seeking damages for personal and advertising injury. Aplt. App., Vol. VII at 1946. The National Union policy also imposed a duty to defend the insureds against these suits, but only upon exhaustion of the New Hampshire policy limits. Under both policies, however, there was no duty to defend the insureds against a suit

3

seeking damages for personal and advertising injury "to which this insurance does
not apply." Aplt. App., Vol. VII at 1946; Vol. IX at 2495.

### B.    The Underlying Lawsuit

In February 2020 Telluride Resort & Spa, LLC (Telluride) and its principals
Ted and Todd Herrick (collectively the Underlying Plaintiffs) sued TSG, Peaks
Hotel, the POA, and H. Curtis Brunjes (collectively the TSG Parties) in Colorado
state court. The fifth amended complaint alleged the following:[2]

The Peaks is a mixed-use condominium building operated as a ski-in/ski-out
resort in Mountain Village, Colorado. The building is comprised of about 177
residential condo units, 14 commercial units, and 26 penthouse units. The residential
condo units were typically rented out to visitors through The Peaks' rental program,
operating like a hotel. Between 2009 and mid-2015 Telluride was the sole owner of
all residential and commercial units in The Peaks. The penthouse units were owned
by private parties unaffiliated with Telluride.

The building's business and affairs were governed by the POA, its
homeowners' association. The POA's elected board of directors, which included Mr.

---

[2] Because "[a]n amended complaint supersedes the original complaint and
becomes the sole statement of the plaintiff's cause of action," *In re Marriage of
Lockwood*, 857 P.2d 557, 561 (Colo. App. 1993), we confine our review of the
allegations in the underlying lawsuit to those contained in the fifth amended
complaint, which was the final version of the complaint. *See Cyprus Amax Min. Co.
v. Lexington Ins. Co.*, 74 P.3d 294, 298 n.2 (Colo. 2003) (reviewing the allegations in
the "Second Amended Complaint" filed against the insured to determine whether the
insured's loss was covered because that complaint "form[ed] the basis of argument in
the case at hand").

Brunjes, managed and oversaw the expenses incurred to maintain and operate The Peaks' common elements (owned as tenants in common by the owners of the residential, commercial, and penthouse units). The owners were subject to annual homeowners' assessments from the POA to pay these expenses.

Telluride paid all these assessments on its residential and commercial condominium units through what was known as the "True-Up Process." Under this process, each year the POA allocated 80% of the budgeted common-area maintenance and operating expenses to Telluride, which owned roughly 80% of the building based on unit square footage, with the remaining 20% allocated to the penthouse owners. The POA would remit to Telluride the assessments collected from the penthouse owners (20% of the budgeted expenses). Telluride would then pay The Peaks' expenses as they were incurred throughout the year. At the end of each year the POA board would credit Telluride's expense payments against the total assessments owed by Telluride. If the POA expenses paid by Telluride exceeded the amount of budgeted expenses previously allocated to it, the penthouse owners would pay their share of the difference to Telluride. On the other hand, if the POA expenses paid by Telluride were less than the amount of budgeted expenses previously allocated to it, Telluride would pay its share of the difference to the penthouse owners. The True-Up Process referred to this entire sequence, from Telluride paying all the expenses incurred on the building's common elements to the settling of accounts at the end of the year. Notably, Telluride would never pay any of these assessments directly to the POA. (It is unclear from the record whether there were

"spa" assessments imposed on the owners of the residential and penthouse units that were paid through a different process.)

In July 2015 TSG purchased from Telluride all but one of the commercial units in The Peaks. During the due-diligence period leading up to the acquisition, TSG officers and accountants learned about and examined the True-Up Process. Through its wholly-owned subsidiary Peaks Hotel, TSG assumed control over The Peaks property, the rental program for the residential condo units, and the POA's board of directors. After the purchase an entity related to TSG also acquired a number of penthouse and residential condo units in the building.

Peaks Capital Partners, the sole manager and member of Telluride, then distributed its remaining residential condo units to its investors. Through this transaction, Highlands Resorts at the Peaks, LLC (Highlands), another entity managed by Todd Herrick, became the owner of 47 residential condo units that were formerly owned by Telluride. Telluride kept one residential condo unit and Ted Herrick personally obtained ownership of another.

In late 2018 the TSG Parties began implementing a three-part scheme to coerce the Underlying Plaintiffs into paying annual assessments that the TSG Parties knew were not owed. First, the TSG Parties commissioned a "sham" audit of the annual assessments paid by Telluride between 2009 and mid-2015. Aplt. App., Vol. III at 572–73. They manipulated the audit to overlook payments made by Telluride through the True-Up Process, guaranteeing that TSG's accountant would erroneously

conclude that Telluride had failed to pay any assessments during the relevant time period.

Second, the TSG Parties retained an accounting firm to examine Telluride's payment of assessments. But the TSG Parties intentionally limited the scope of the accounting firm's evaluation to include only those assessments, if any, that were paid via direct deposits to the POA's bank accounts; as a result, the firm failed to identify any payment of assessments by Telluride accomplished through the True-Up Process.

Finally, TSG and the POA, through the POA's outside legal counsel, circulated to Telluride, the Herricks, all individual members of the POA, and numerous third parties (including leaders of the local business community) a debt-collection letter. The letter falsely stated that "[Telluride] and the individuals and entities associated with it" failed to pay *any* annual assessments on their residential condo and commercial units from 2010 to mid-2015, owing more than $15.5 million in unpaid assessments. Aplt. App., Vol. III at 606 (internal quotation marks omitted). The letter demanded payment and threatened legal action to collect the amounts due. It contained no acknowledgement that Telluride had paid assessments through the True-Up Process and claimed there was no "evidence that [Telluride] *ever* was assessed and/or paid operating dues" on the units it owned. Aplt. App., Vol. III at 606–07 (internal quotation marks omitted and emphasis added). Knowing that the representations in the debt-collection letter were false, the TSG Parties circulated the letter in an effort to coerce the Underlying Plaintiffs into making payments they did not owe.

7

The Underlying Plaintiffs all asserted claims for relief against the TSG Parties for (1) violating the Colorado Common Interest Ownership Act (CCIOA), Colo. Rev. Stat. § 38-33.3-209.5 (against the POA); (2) breach of fiduciary duty (against all defendants); (3) aiding and abetting breach of fiduciary duty (against TSG); (4) civil conspiracy (against all defendants); and (5) negligence (against all defendants). In addition to compensatory damages, the Underlying Plaintiffs sought punitive damages, attorney fees, and costs.

The underlying lawsuit proceeded to trial in June 2022.[3] The testimony of several POA board members who approved the debt-collection letter established that they knew the Underlying Plaintiffs did not owe $15.5 million in unpaid assessments. Board members Mr. Brunjes, William Jensen (who was also the chief executive officer of TSG), and James Richards (who was also TSG's chief financial officer) all testified that when the letter was circulated, they knew Telluride had paid assessments through the True-Up Process and that the $15.5-million demand failed to account for those payments.

The jury returned a verdict for the Underlying Plaintiffs on all claims that proceeded to trial. It awarded the Underlying Plaintiffs $225,000 in compensatory damages but declined to award punitive damages. The court awarded the Underlying Plaintiffs $2,298,225 in statutory attorney fees and $328,510.53 in costs.

---

[3] The claims against Peaks Hotel were dismissed by the Underlying Plaintiffs before trial.

## C.     The Present Litigation

The TSG Parties requested defense and indemnification coverage for the claims filed against them, but the Insurers disclaimed coverage for all claims based on the policies' knowledge-of-falsity exclusions.[4] New Hampshire nevertheless agreed to defend the TSG Parties subject to a "full reservation of rights," which included the right to withdraw the defense, the right to seek reimbursement for defense expenses, and the right to seek declaratory relief. Aplt. App., Vol. X at 2707.

The Insurers then filed this action in the United States District Court for the District of Colorado, seeking a declaratory judgment that they had no duty to defend or indemnify the TSG Parties in the underlying litigation. New Hampshire also sought reimbursement for the amounts it had spent on representing the insureds in the underlying litigation. The TSG Parties responded with counterclaims for breach of contract, common-law bad faith, and statutory bad faith against the Insurers. The counterclaims were premised on, among other things, the Insurers' allegedly wrongful repudiation of their duty to provide a defense, failure to take action to settle the claims, and refusal to indemnify the TSG Parties in the underlying lawsuit.

The Insurers moved for summary judgment. The district court granted their motion on all claims, concluding that they had no duty to defend or indemnify the TSG Parties because the knowledge-of-falsity exclusions "expressly preclude

---

[4] Although Mr. Brunjes was not a named insured, he claimed coverage under the policies "as a member, officer, and director of the POA." Aplt. App., Vol. I at 248.

coverage for loss relating to [the] Underlying Plaintiffs' claims and damages." *N.H. Ins. Co. v. TSG Ski & Golf, LLC*, 673 F. Supp. 3d 1191, 1203 (D. Colo. 2023). And the court determined that the Insurers were entitled to summary judgment on the TSG Parties' counterclaims for breach of contract and common-law and statutory bad faith because coverage was properly denied.

The TSG Parties appeal. Exercising jurisdiction under 28 U.S.C. § 1291, we affirm.

## II.    DISCUSSION

### A.    Standard of Review

We review the district court's grant of summary judgment de novo, applying the same legal standard that the district court is to apply. *See Pompa v. Am. Fam. Mut. Ins. Co.*, 520 F.3d 1139, 1142 (10th Cir. 2008). Summary judgment is appropriate when "there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

"When, as here, a federal court is exercising diversity jurisdiction, it must apply the substantive law of the forum state." *Blackhawk-Central City Sanitation Dist. v. Am. Guar. & Liab. Ins. Co.*, 214 F.3d 1183, 1188 (10th Cir. 2000). The parties agree that Colorado law governs our interpretation of the insurance policies. Our review of the district court's interpretation of Colorado law is de novo. *See Chavez v. Ariz. Auto. Ins. Co.*, 947 F.3d 642, 645 (10th Cir. 2020). Ordinarily, our task is to predict how the Colorado Supreme Court would rule on the legal issues after examining other authority, such as its rulings on similar issues, rulings by the

State's lower courts, the law in other jurisdictions, and relevant treatises. *See Bertels v. Farm Bureau Prop. & Cas. Ins. Co.*, 123 F.4th 1068, 1078 (10th Cir. 2024). But that enterprise is not necessary when, as here, the State's highest court has already provided an answer to the legal questions before us. In that situation, we simply "apply the most recent statement of Colorado law by the Colorado Supreme Court." *Blackhawk*, 214 F.3d at 1188.

### B.    Duty to Defend

We begin by examining whether the Insurers had a duty to defend the TSG Parties in the underlying lawsuit. We conclude they did not because the policies' knowledge-of-falsity exclusions bar coverage.

### 1.    Principles of Colorado Insurance Law

Colorado courts "construe an insurance policy's terms according to principles of contract interpretation." *Thompson v. Md. Cas. Co.*, 84 P.3d 496, 501 (Colo. 2004). "The words of the contract should be given their plain meaning according to common usage, and strained constructions should be avoided." *Allstate Ins. Co. v. Huizar*, 52 P.3d 816, 819 (Colo. 2002).

"The duty to defend pertains to the insurance company's duty to affirmatively defend its insured against pending claims." *Const. Assocs. v. N.H. Ins. Co.*, 930 P.2d 556, 563 (Colo. 1996). Whether this duty exists is determined by application of the "complaint rule." *Cyprus Amax Min. Co. v. Lexington Ins. Co.*, 74 P.3d 294, 301 (Colo. 2003) (internal quotation marks omitted). Under this rule, courts compare the factual allegations in the underlying complaint to the terms of the insurance policy.

*See Hecla Min. Co. v. N.H. Ins. Co.*, 811 P.2d 1083, 1089–90 (Colo. 1991). When the complaint "alleges any facts that might fall within the coverage of the policy," the duty to defend arises. *Id.* at 1089; *accord Thompson*, 84 P.3d at 502.

But an insurer need not defend its insured when "an exclusion in the insurance policy precludes coverage." *Thompson*, 84 P.3d at 502. To avoid the duty to defend, the insurer must establish "that the allegations in the complaint are solely and entirely within the exclusions in the insurance policy"; that is, "that there is no factual or legal basis" on which the insurer might eventually owe coverage. *Cotter Corp. v. Am. Empire Surplus Lines Ins. Co.*, 90 P.3d 814, 829 (Colo. 2004) (internal quotation marks omitted). The insurer must also show that the exclusions actually "appl[y] in the particular case, and that the exclusions are not subject to any other reasonable interpretations." *Compass Ins. Co. v. City of Littleton*, 984 P.2d 606, 619 (Colo. 1999) (internal quotation marks omitted).

## 2.    Application

The definition in the policies of *personal and advertising injury* includes "[o]ral or written publication . . . of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services." Aplt. App., Vol. VII at 1955; Vol. IX at 2514 (comma omitted). Although the fifth amended complaint does not bring a claim for libel, slander, or disparagement, the parties have agreed that the allegations in the complaint fell within the scope of coverage for suits seeking damages for personal and advertising injury. *See Thompson*, 84 P.3d at 502 (A duty to defend may arise "[w]hen all the elements of a

claim covered by a policy are alleged, . . . even if a claim is not labeled according to
the terms used in an insurance policy."). Namely, the complaint alleged the elements
of libel and disparagement, including: the debt-collection letter contained false
statements, was circulated to third parties, and caused the Underlying Plaintiffs to
suffer significant financial harm and reputational damage.[5]

By the same token, however, the allegations in the complaint triggered the
policies' knowledge-of-falsity exclusions. The exclusions barred coverage for
personal and advertising injury "*arising out of* oral or *written publication* . . . of
material, if *done* by or at the direction of the insured *with knowledge of its falsity*."
Aplt. App., Vol. VII at 1946 (emphasis added); *see* Aplt. App., Vol. IX at 2504.

Each element of the exclusions was alleged. First, the Underlying Plaintiffs
repeatedly alleged that their injuries arose out of, or were caused by, the publication
of false statements in the debt-collection letter. *See N. Ins. Co. of N.Y. v. Ekstrom*,
784 P.2d 320, 323 (Colo. 1989) (explaining that *arising out of* is "construed to bar

---

[5] *See L.S.S. v. S.A.P.*, 523 P.3d 1280, 1287 (Colo. App. 2022) ("The elements
of a defamation [or libel] claim are: (1) a defamatory statement concerning another;
(2) published to a third party; (3) with fault amounting to at least negligence on the
part of the publisher; and (4) either actionability of the statement irrespective of
special damages or the existence of special damages to the plaintiff caused by the
publication." (internal quotation marks omitted)); *Thompson*, 84 P.3d at 507 n.16
("The tort of disparagement consists of the following elements: (1) a false statement;
(2) published to a third party; (3) derogatory to the plaintiff's title to his property or
its quality, to his business in general or to some element of his personal affairs; (4)
through which defendant intended to cause harm to the plaintiff's pecuniary interest
or either recognized or should have recognized that it was likely to do so; (5) malice;
and (6) special damages.").

coverage where, *but for* the [excluded] cause of loss, the injury would not have occurred"). Second, the complaint alleged that the false statements in the debt-collection letter were published to "numerous third parties and prominent members of the [town of] Telluride business community." Aplt. App., Vol. III at 622. And third, the complaint was replete with allegations that the false statements were published by the TSG Parties with knowledge of their falsity. The relevant allegations were as follows:

1. This action arises out of Defendants' conduct in designing and then implementing a coordinated scheme intended to unlawfully coerce Plaintiffs into paying money to the POA and TSG *that Defendants knew was not owed.* Aplt. App., Vol. III at 571 (emphasis added).

11. . . . . At the time the POA, TSG, and Brunjes broadly published the Debt Collection Letter, they *knew that the letter's calculation of allegedly unpaid assessments was false and misleading. Id.* at 574–75 (emphasis added).

156. In the Debt Collection Letter, the POA, TSG, and Brunjes *intentionally misrepresented the scope and reliability of the "internal audit"* performed by TSG and Peaks Hotel, LLC. *Id.* at 609 (emphasis added).

157. In the Debt Collection Letter, the POA, TSG, and Brunjes also *blatantly misrepresented the nature and scope of* [*the accounting firm's*] *engagement. Id.* (emphasis added).

158. The POA, TSG, and Brunjes *knowingly and intentionally circulated these false statements through the publication of the Debt Collection Letter. Id.* (emphasis added).

159. The POA, TSG, and Brunjes authorized the publication of the Debt Collection Letter *despite knowing that the statements and positions set forth in the letter were false and misleading. Id.* at 610 (emphasis added).

160. The POA, TSG, and Brunjes' conduct in *knowingly publishing false and misleading statements* was an egregious breach of the fiduciary

14

obligations of care, loyalty, and good faith they owed to Plaintiffs. *Id.* (emphasis added).

161. The POA, TSG, and Brunjes' conduct in *knowingly publishing false and misleading statements* through the Debt Collection Letter was reckless, intentional, and performed with malice and in bad faith. *Id.* (emphasis added).

213. Defendants' conduct . . . has directly and proximately caused Plaintiffs to experience significant monetary harm. These actions by Defendants include . . . *knowingly publishing a series of false and misleading statements regarding Plaintiffs to be published to numerous third parties through the Debt Collection Letter . . . . Id.* at 622 (emphasis added).

236. The POA breached its fiduciary duties . . . by . . . *knowingly approving the publication of false and misleading statements through the Debt Collection Letter . . . . Id.* at 627 (emphasis added).

241. Brunjes breached his fiduciary duties . . . by . . . *knowingly authorizing a series of false and misleading statements regarding Plaintiffs to be circulated to numerous third parties through the Debt Collection Letter . . . . Id.* at 628 (emphasis added).

255. Acting as the de facto manager of the POA and The Peaks, TSG . . . *enabled knowingly false and misleading statements to be widely circulated through the Debt Collection Letter. Id.* at 631 (emphasis added).

261. . . . [T]hrough publishing the Debt Collection Letter TSG *knowingly participated in and encouraged the POA's publication of false and misleading information. Id.* at 632 (emphasis added).

267. As alleged in this Complaint, Defendants acted in a willful and wanton manner through their conduct in . . . *knowingly publishing a false and misleading Debt Collection Letter* in order to advance Defendants' improper and unlawful objectives. *Id.* at 633 (emphasis added).

Because the allegations in the complaint fell entirely within the knowledge-of-

falsity exclusions, the Insurers did not have a duty to defend the TSG Parties in the

underlying lawsuit.

### 3.    Counterarguments

The TSG Parties raise several arguments why the knowledge-of-falsity exclusions did not preclude coverage. We are not persuaded.

To begin with, the TSG Parties contend that the allegations of knowing falsity in the complaint may not be considered in evaluating the Insurers' duty to defend because proving them was not required to impose liability. True, as reflected in the jury instructions, none of the claims for relief asserted in the fifth amended complaint—which included claims for violation of the CCIOA, breach of fiduciary duty, aiding and abetting breach of fiduciary duty, civil conspiracy, and negligence—contained knowledge of falsity as an element. But this argument is squarely foreclosed by Colorado law.

In *Thompson* the Colorado Supreme Court considered a quite similar situation. *See* 84 P.3d at 499–503, 505–08. In that case, the insurance policies provided coverage against liability on claims of disparagement. *See id.* at 499. Although the complaint against the insured did not include a claim for disparagement, the complaint fell within the coverage of the policies because the allegations in the complaint stated the elements of a disparagement claim. *See id.* at 505–07. But the policies contained a knowledge-of-falsity exclusion identical to the one in the policies here. *See id.* at 499 n.2. Therefore, the court examined whether the allegations involving disparagement stated that the disparagement was knowingly false. *See id.* at 507–08. Determining that they did, the court held that the exclusion applied and there was no duty to defend. *See id.* at 508.

16

We fail to see how to distinguish *Thompson* from this case. The effort by the TSG Parties misses the mark. First, they argue that *Thompson* did not decide whether courts evaluating the duty to defend may rely on allegations of knowing falsity that were unnecessary to establish any claims in the complaint. We do not agree. In determining the applicability of the knowledge-of-falsity exclusion, *Thompson* did not even consider the elements of the claims set forth in the complaint. It looked only at the allegations involving disparagement, which, although not alleged as a claim, were essential to the initial determination that there was potentially coverage under the policies. *See id.* at 505–07. The approach of the Colorado Supreme Court was totally inconsistent with the view of the TSG Parties that the exclusion applies only if willful falsehood was an element of the claims in the complaint. *See* Bryan A. Garner et al., *The Law of Judicial Precedent* § 10 at 120 (2016) ("[I]f a proposition's validity is logically necessary to the result of a given case, the case will generally be treated as standing for that proposition even if the point wasn't explicitly stated by the court.").

Next, the TSG Parties appear to argue that *Thompson* was wrongly decided, asserting that "most" of the jurisdictions that have considered this question do not consider extraneous allegations of knowing falsity when evaluating the duty to defend. Aplt. Br. at 32. For support, they direct us to seven federal district court cases applying the law of other states. Such contrary authority could be persuasive if we were trying to predict how the Colorado Supreme Court *would* rule on this issue. But here we already have a ruling by the state high court that is as close as it gets to a

ruling on the identical issue. Our task is not to reach our "own judgment" on

Colorado law but rather to "ascertain and apply the state law." *Wade v. EMCASCO*

*Ins. Co.*, 483 F.3d 657, 665 (10th Cir. 2007) (internal quotation marks omitted).

Because we are bound by the most recent decisions of the Colorado Supreme Court,

*Thompson* controls.[6] *See Kokins v. Teleflex, Inc.*, 621 F.3d 1290, 1295 (10th Cir.

2010).

　　　The TSG Parties then try to distinguish *Thompson* on the facts. They argue that

there were conflicting allegations in the Underlying Plaintiffs' complaint about

whether the TSG Parties knew the statements in the debt-collection letter were false

before the letter was circulated. The complaint alleged that the TSG Parties admitted

the $15.5-million figure was incorrect after the debt-collection letter was published.

The TSG Parties assert that these allegations "stand in contrast" to the allegations of

prepublication knowledge of falsity elsewhere in the complaint. Aplt. Reply Br. at 9.

And any doubts in the underlying pleadings about whether an exclusion applies, they

contend, must be resolved in favor of a duty to defend.

　　　But the allegations created no ambiguity on when the TSG Parties knew the

statements in the debt-collection letter were false. The complaint unmistakably

alleged that the TSG Parties knew the statements in the debt-collection letter were

false "[a]t the time" the letter was published. Aplt. App., Vol. III at 574–75 ("At the

time the POA, TSG, and Brunjes broadly published the Debt Collection Letter, they

---

　　　[6] We note that neither party has asked us to certify a question of state law to
the Colorado Supreme Court.

knew that the letter's calculation of allegedly unpaid assessments was false and misleading."). That they later admitted that they knew the statements were false is not in the least inconsistent with their earlier knowledge of falsity.

Not relenting, the TSG Parties parse the claims of the Underlying Plaintiffs, arguing that at least the claims of Telluride's principals, the Herricks, triggered a duty to defend. They argue that the allegations of knowing falsity in the complaint were premised on allegations that the TSG Parties knew *Telluride* had used the True-Up Process to pay its annual assessments; but they point out that the complaint did not allege that the *Herricks* themselves had ever used the True-Up Process to pay the assessments for the units in The Peaks that they personally owned. Thus, they say, the claims of the Herricks were not anchored in any allegations of knowing falsity and did not trigger the coverage exclusions.

This argument fails because it misstates the claims made by the Herricks. The Herricks did *not* allege that they personally owned any units or that they were personally responsible for paying assessments for any units during the 2010–2015 period of nonpayment alleged in the debt-collection letter. Nor did the Herricks complain that the debt-collection letter accused them of personally failing to pay assessments during that period for any units that they individually owned. Instead, the Herricks alleged (1) that Telluride owned *all* the residential condo and commercial units in The Peaks during the relevant 2010–2015 period; (2) that Telluride paid assessments for these units using the True-Up Process; and (3) that the TSG Parties knew their demand for $15.5 million in unpaid assessments did not

account for any payments of assessments by Telluride that were accomplished through this process. The claims of the Herricks were based on the same allegations of knowing falsity as the claims of Telluride and fell entirely within the exclusions.

The TSG Parties point to language in the underlying complaint alleging that the debt-collection letter accused the Herricks of failing to pay assessments. But in light of the other allegations in the complaint, that failure could have arisen in only two ways. First, the allegations may refer to the Herricks in their capacity as principals of Telluride. In other words, the alleged failure of Telluride to pay assessments may have been attributed to them. But the Herricks alleged that any claim that Telluride had failed to pay assessments was knowingly false because the TSG Parties knew that Telluride had paid its assessments using the True-Up Process. Second, the allegations may refer to the Herricks in their capacity as owners of residential condo units in The Peaks. But they did not personally own any units before TSG acquired its interest in The Peaks in 2015. Therefore, any debt attributed to the Herricks could only have arisen from their acquisition of units on which assessments had allegedly not been paid by Telluride during the 2010–2015 period. Once again, however, these accusations against the Herricks must have been knowingly false because they were based on the knowingly false claim that Telluride had failed to pay its assessments during the relevant period.

Because the knowledge-of-falsity exclusions preclude coverage, the Insurers had no duty to defend the TSG Parties in the underlying lawsuit.

C.    **Duty to Indemnify**

We now turn to whether the Insurers had a duty to indemnify the TSG Parties
for the judgment awarded against them in the underlying litigation.[7] We conclude
they did not because testimony in the underlying trial established that the TSG
Parties knew the statements in the debt-collection letter were false when the letter
was published.

"The duty to indemnify relates to the insurer's duty to satisfy a judgment
entered against the insured." *Cyprus*, 74 P.3d at 299. Unlike the duty to defend,
"[t]he duty to indemnify arises only when the policy actually covers the harm and
typically cannot be determined until the resolution of the underlying claims." *Id.* at
301. Ordinarily, "where no duty to defend exists, it follows that there can be no duty
to indemnify." *Id.* at 300. This proposition generally applies to the situation where
coverage depends on the causes of action alleged against the insured; if none of the
covered causes of action is alleged (so there is no duty to defend), there could be no
duty to indemnify either. But this proposition does not necessarily apply in the
present situation, where the facts on which the exclusions depend are independent of
the elements of the causes of action alleged.

The TSG Parties argue that our duty-to-indemnify review is limited to the
verdict form in the underlying litigation and may not include testimony from trial.

---

[7] For the purposes of our duty-to-indemnify analysis, the "TSG Parties"
designation does not include Peaks Hotel because the claims against it were dismissed
before trial.

They contend that only when "the verdict is unclear about whether the basis for the
liability imposed is a covered claim" may we turn to the trial evidence. Aplt. Br. at
38. And they assert that the verdict form was not unclear because it neither expressly
nor impliedly established that the jury made any findings of knowing falsity.

The TSG Parties misconstrue the Colorado Supreme Court's guidance in
*Cyprus*. That opinion declares that when, as here, the claims "proceed through the
crucible of trial," "the court must look to the facts as they developed at trial and the
ultimate judgment" to determine whether an insurer has a duty to indemnify the
insured. *Cyprus*, 74 P.3d at 301. And as we read *Cyprus*, when the ultimate judgment
or verdict does not clearly address the coverage issue, a more searching review of the
evidence is required. *See id*. Here, as previously explained, the exclusions are
independent of the causes of action set forth in the complaint. Looking at the
resolution of those claims does not tell us whether the factual basis for the exclusions
was established at trial. We therefore must examine the evidence.

At trial the uncontroverted testimony of TSG and POA officers (all of whom
sat on the POA board and approved the debt-collection letter) established that the
TSG Parties knew the statements in the debt-collection letter were false when the
letter was published. First, Mr. Brunjes testified that he knew Telluride had paid its
assessments through the True-Up Process, and that he informed the other board
members about the mechanics of this process. He said he was personally familiar
with the True-Up Process because—in his role as an officer and director of the
POA—he prepared and authorized the POA's budget and approved True-Up

22

payments from Telluride between 2009 and 2015. Mr. Brunjes further testified that

he knew "the total amount due [from Telluride] would not be $15 million" because

"there would be an offset." Aplt. App., Vol. V at 1446. And on redirect examination

he confirmed that before sending the debt-collection letter he knew the Underlying

Plaintiffs did not owe $15.5 million in unpaid assessments.

      Mr. Richards also testified that in his role as chief financial officer of TSG he

became aware—before the debt-collection letter was published—that Telluride had

paid its assessments using the True-Up Process. And when he approved the debt-

collection letter he knew it did not account for any assessment payments

accomplished through this process.

      Finally, Mr. Jensen, who was chief executive officer of TSG, testified that he

knew Telluride had used the True-Up Process to pay its assessments before he

authorized the publication of the debt-collection letter. He affirmed that the other

board members likewise knew about this process and "were aware that [Telluride]

paid some of the expenses of the POA" before the letter was circulated. Aplt. App.,

Vol. V at 1278. And Mr. Jensen testified that, despite this knowledge, the POA did

nothing to investigate the True-Up payments before publishing the debt-collection

letter—which was "approved" by "[t]he entire [POA] board." Aplt. App., Vol. V at

1297.

      The testimony of these witnesses established that the liability imposed against

the TSG Parties was precluded from indemnification under the knowledge-of-falsity

exclusions. Both Mr. Richards and Mr. Jensen were officers of TSG (an LLC), and

Mr. Brunjes was an officer of the POA (a corporation); and they were acting in those capacities when they approved the debt-collection letter. Therefore, their knowledge was imputed to these business entities.[8] The false statements in the debt-collection letter were thus knowingly published "by" the insureds within the meaning of the knowledge-of-falsity exclusions. Aplt. App., Vol. VII at 1946; Vol. IX at 2504.

The TSG Parties contend that this evidence merely established, "[a]t best," that the TSG Parties "knew about the true-up process." Aplt. Br. at 43. We disagree. The officers' testimony was twofold: (1) they knew Telluride had paid its assessments through the True-Up Process, and (2) they knew, at the time it was published, that the amount stated in the debt-collection letter failed to account for assessment payments made using this process. Taken together, the admissions by the officers mandate the conclusion that they knew their demand for $15.5 million in unpaid assessments was not true when the letter was published because they knew, at a minimum, that the factual basis for the purported amount owed was plainly deficient.

The TSG Parties make one last pitch. They argue that the jury's refusal to award punitive damages means it found that the debt-collection letter was not

---

[8] *See Dall. Creek Water Co. v. Huey*, 933 P.2d 27, 41 (Colo. 1997) ("It is familiar law that a corporation can only act through its agents, and their acts within the scope of their authority are the acts of the corporation." (internal quotation marks omitted)); *Weston v. T&T, LLC*, 271 P.3d 552, 558 (Colo. App. 2011) (same for an LLC); *Mortg. Invs. Corp. v. Battle Mountain Corp.*, 70 P.3d 1176, 1182 (Colo. 2003) (officers are agents of the corporation and are empowered to act on behalf of the corporation when acting within the proper scope of their authority); *Liggett v. People*, 529 P.3d 113, 126 (Colo. 2023) ("When an agency relationship exists, knowledge obtained by [agents] within the scope of their agency is imputed to the principal.").

published with knowledge of its falsity. They rely on the jury instruction that
punitive damages cannot be awarded unless the jury finds that the defendants acted
"fraudulently, maliciously, or in a willful and wanton manner." Aplt. Br. at 40; *see*
Aplt. App., Vol. X at 2794. But the instruction required the jury to find *beyond a*
*reasonable doubt* that the TSG Parties acted "fraudulently, maliciously or in a willful
and wanton manner" in order to award punitive damages, as Colorado law demands.
Aplt. App., Vol. X at 2794; *see* Colo. Rev. Stat. § 13-25-127(2) (requiring that
"[e]xemplary damages" be proved "beyond a reasonable doubt"). That is a much
stricter burden of persuasion than is required to establish that an exclusion from
coverage applies. In Colorado "[t]he insurer bears the burden of establishing that an
exclusion applies." *First Citizens Bank & Tr. Co. v. Stewart Title Guar. Co.*, 320
P.3d 406, 410 (Colo. 2014). And Colorado law states that the default burden of proof
in any civil action is the preponderance of the evidence. *See* Colo. Rev. Stat. § 13–
25–127(1); *Griffith v. SSC Pueblo Belmont Operating Co.*, 381 P.3d 308, 313 n.3
(Colo. 2016). That proposition applies to insurance disputes. *See, e.g., Sylvester v.*
*Liberty Life Ins. Co.*, 42 P.3d 38, 39 (Colo. App. 2001) ("In an accidental death
insurance policy case, . . .  [t]he insurance company . . . has the burden of proving the
applicability of any exclusions by a preponderance of the evidence."); *cf. Fought v.*
*UNUM Life Ins. Co. of Am.*, 379 F.3d 997, 1007 (10th Cir. 2004) (stating that
"[u]nder ERISA, an insurer bears the burden to prove facts supporting an exclusion
of coverage" and citing authorities requiring proof by a preponderance of the
evidence). Of course, a jury or a court could find by a preponderance of the evidence

that the requirements of the exclusions were met but that the punitive-damages standard was still not satisfied beyond a reasonable doubt. *See Fireman's Fund Ins. Co. v. Stites*, 258 F.3d 1016, 1022 (9th Cir. 2001) ("[A] failure to prove a fact beyond a reasonable doubt does not mean that it cannot be proven by a preponderance of the evidence.").

For the foregoing reasons, we hold that the Insurers owed no duty to indemnify the TSG Parties for their losses in the underlying lawsuit.

### D.    The TSG Parties' Counterclaims

Having concluded that the TSG Parties were not entitled to defense or indemnification coverage under the policies as a matter of law, we also affirm the district court's grant of summary judgment in the Insurers' favor on the TSG Parties' counterclaims for breach of contract and common-law and statutory bad faith, since those claims flow from the denial of coverage and "must fail" if coverage was properly denied. *MarkWest Hydrocarbon, Inc. v. Liberty Mut. Ins. Co.*, 558 F.3d 1184, 1193 (10th Cir. 2009) ("It is settled law in Colorado that a bad faith claim must fail if . . . coverage was properly denied and the plaintiff's only claimed damages flowed from the denial of coverage."); *see Lamb v. GEICO Gen. Ins. Co.*, 77 P.3d 748, 751 (Colo. App. 2002) (rejecting insured's breach-of-insurance-contract claim because coverage was properly denied).

### III.    CONCLUSION

We **AFFIRM** the district court's grant of summary judgment on all claims.